**In re James P. ROTI, Debtor.**

**Brenda Porter Helms, not individually, but as Trustee, Plaintiff,**

v.

**Barbara Roti, Julie Marie Nelmark and Ann Greco, Defendants.**

**Bankruptcy No. 99 B 15306.**
**Adversary No. 00 A 01179.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Jan. 7, 2002.

Jeffrey W. Finke, Chicago, IL, for Plaintiff/Trustee.

Bruce de'Medici, Law Offices of Bruce de'Medici, PC, Oak Park, IL, for Defendants.

Brenda Porter Helms, The Helms Law Firm, P.C., Wheaton, IL, Trustee.

### MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the second amended complaint filed by Brenda Porter Helms, not individually, but as Chapter 7 case trustee (the "Trustee") of the estate of James P. Roti (the "Debtor") against Barbara Roti,[1] Julie Marie Nelmark and Ann Greco (collectively the "Defendants"). For the reasons set forth herein, the Court grants judgment in favor of the Trustee and against Defendants Julie Marie Nelmark and Ann Greco pursuant to Count I of the complaint. Each Defendant is ordered under 11 U.S.C. § 542 to turn over to the Trustee the sum of $29,850.00, plus prejudgment interest of $1,695.04 from December 22, 2000 through January 7, 2002. In addition, the Court enters judgment in favor of the Trustee and against Defendants Julie Marie Nelmark and Ann Greco under Counts II and III of the complaint. The Court holds that the transfers made by the Debtor to the Defendants were fraudulent pursuant to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 548(a)(1)(B). Under 11 U.S.C. § 550(a)(1), the Trustee may recover those transfers in the sum of $29,850.00 from each Defendant for the benefit of the Debtor's estate, plus prejudgment interest of $1,695.04 from December 22, 2000 through January 7, 2002. Finally, the Court enters judgment in favor of the Trustee and against Defendants Julie Marie Nelmark and Ann Greco under Counts IV, V and VI of the complaint. The Court holds that the transfers from the Debtor to the Defendants were fraudulent pursuant to 740 ILCS 160/5(a)(1), 160/5(a)(2) and 160/6(a). Under 11 U.S.C. § 544(b)(1), the Trustee may recover those transfers in the sum of $29,850.00 from each Defendant for the benefit of the Debtor's estate, plus prejudgment interest of $1,695.04 from December 22, 2000 through January 7, 2002.

### I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(E) and (H).

### II. FACTS AND BACKGROUND

Many of the underlying facts are undisputed and have been stipulated to by the parties. On November 6, 1996, American National Bank (the "Bank") filed a lawsuit against the Debtor seeking $428,170.75. On May 7, 1997, the Debtor executed a

---

1. On September 28, 2001, the Trustee settled the asserted causes of action against Barbara Roti, the former spouse of the Debtor and the mother of the other two Defendants.

personal financial statement listing total assets of $838,779.00 and total liabilities of $1,059,767.00, resulting in a negative net worth of $220,988.00. *See* Trustee's Exhibit No. 2.

In the period 1997–1999, Act 10, Ltd. ("Act 10") was an Illinois corporation whose sole shareholder was the Debtor. During that period, Act 10, Ltd. did not do any business. Advantage Floor Machine Company ("Advantage") was an Illinois corporation which was incorporated on December 29.1997. The Debtor was its sole shareholder. Hild Floor Machine Co. ("Hild") was an Illinois corporation whose sole shareholder was the Debtor. On September 6, 1997, the Debtor withdrew $100,000.00 from his Dean Witter securities account and deposited the proceeds in the bank account of Act 10, Ltd. *See* Trustee's Exhibit No. 3.

On September 11, 1997, the Bank obtained a judgment against the Debtor and Hild in the amount of $428,170.75. *See* Trustee's Exhibit No. 5. In an attempt to enforce that judgment, on December 21, 1997, the Bank served a citation to discover assets on the Debtor, which was returnable on January 26, 1998. *See* Trustee's Exhibit No. 6. On January 23, 1998, the Debtor filed his first Chapter 7 petition which listed one creditor—the Bank. *See* Trustee's Exhibit No. 7. That same date, Hild filed a Chapter 11 petition. That case was converted to Chapter 7 on March 19, 1998. The Debtor's case was dismissed on May 8, 1998.

On June 2, 1998, the Bank filed a motion to compel a citation examination of the Debtor in the state court case. *See* Trustee's Exhibit No. 9. On September 30, 1998, a rule to show cause was entered against the Debtor in that case. *See* Trustee's Exhibit No. 10.

On February 4, 1999, ten checks each in the amount of $9,950.00 were issued to the Debtor by the Northern Trust Company from Roseland Limited Partnership ("Roseland") funds. *See* Trustee's Group Exhibit No. 18. Roseland was a family partnership in which the Debtor was a general partner and Defendants Ann Greco and Julie Marie Nelmark, his daughters, were limited partners. Also on February 4, 1999, fourteen other Roseland partners, including the Defendants, were each issued one check from the Northern Trust in the amount of $99,500.00. *See* Trustee's Group Exhibit No. 19 and Exhibit No. 20.

On February 24, 1999, the Debtor was served with the rule to show cause in the state case. *See* Trustee's Exhibit No. 14. On February 27, 1999, Defendant Ann Greco deposited in her bank account three Northern Trust Company checks each in the amount of $9,950.00 which the Debtor had endorsed over to her. *See* Trustee's Exhibit Nos. 21C, 21D and 21E. She was told by the Debtor that he could not open a bank account and he asked her to use her account to pay his expenses. Ann Greco did not enter into any written agreement with the Debtor at or after the date the Debtor delivered to her the three checks totaling $29,850.00. Also on February 27, 1999, Defendant Julie Marie Nelmark deposited in her bank account three Northern Trust checks each in the amount of $9,950.00 which the Debtor had endorsed over to her. *See* Trustee's Exhibit Nos. 22B, 22C and 22D and Defendants' Exhibits A and B. Like her sister, Julie Marie Nelmark was asked by the Debtor to use her account to pay his expenses. She did not enter into any written agreement with the Debtor at or after the date he delivered to her the three checks totaling $29,850.00.

On March 2, 1999, a body attachment for contempt of court was issued by the state court against the Debtor. *See* Trustee's

Exhibit No. 15. He was sent notice on March 23, 1999, by the Cook County Sheriff, that a warrant for his arrest had been issued. On April 9, 2001, at the Debtor's request, Defendant Ann Greco wrote a check on her own bank account payable to the Debtor in the amount of $10,000.00. April 27, 1999, was the deadline for the Debtor to turn himself into the custody of the Cook County Sheriff or face arrest in the state court case. *See* Trustee's Exhibit No. 16.

On May 12, 1999, the Debtor filed the second and current Chapter 7 petition. *See* Trustee's Exhibit No. 25. On May 25, 1999, at the Debtor's request, Defendant Julie Marie Nelmark wrote a check on her bank account payable to Act 10 in the amount of $15,000.00. *See* Defendants' Exhibit C. On June 17, 1999, at the Debtor's request, Defendant Julie Marie Nelmark wrote a check on her bank account payable to Advantage in the amount of $14,000.00. *Id.* On June 23, 1999, at the Debtor's request, Defendant Ann Greco wrote a check on her bank account payable to the Debtor in the amount of $22,000.00. *See* Defendants' Exhibit G. The Debtor endorsed that check over to his former spouse, Defendant Barbara Roti. *Id.*

On August 11, 1999, the Debtor filed his Schedules in the bankruptcy case, which listed $521,275.00 in assets and $970,686.00 in liabilities. *See* Trustee's Exhibit No. 26. Neither the Schedules nor the answers to his Statement of Financial Affairs, which have never been amended, mention any of the funds resulting from the six Northern Trust Company checks delivered by the Debtor to the Defendants. *Id.*

The Debtor received $148,491.32 from Roseland during calendar year 1999. According to the Debtor, he spent $112,095.05 during the period January 28, 1999, to November 2, 1999. *See* Defendants' Exhibit H.

On December 22, 2000, the Trustee filed the instant adversary proceeding. The Trustee seeks to avoid and recover the proceeds of the six checks transferred from the Debtor to the Defendants in the sum of $9,950.00 per check, for a total of $29,850.00 against each Defendant, plus prejudgment interest from December 22, 2000 through December 22, 2001. Pursuant to the second amended complaint, the Trustee seeks the following relief: (1) turnover of the subject transfers pursuant to 11 U.S.C. § 542; (2) avoidance of the transfers as fraudulent under 11 U.S.C. §§ 548(a)(1)(A) and 548(a)(1)(B); and (3) avoidance of the transfers as fraudulent under 11 U.S.C. § 544 and 740 ILCS 160/5(a)(1), 160/5(a)(2) and 160/6(b).

The Defendants deny that they were transferees who had control over the check proceeds. Further, they assert that they acted in good faith, and that the Debtor received reasonably equivalent value for the challenged transfers because they transferred the proceeds either to the Debtor or to others at his direction. The Court held an evidentiary hearing and thereafter took the matter under advisement.

## III. SUMMARY OF THE TESTIMONY

The Debtor admitted that he spent $112,000.00 over the nine month period in 1999 in maintaining his home and boat, but did not pay on the judgment obtained by the Bank because he "had to live first." He contended that he relied on his attorney's advice when he filed his Schedules, which included Schedule J, listing his current monthly expenses totaling an average of $6,155.00 per month as of June 12, 1999. He admitted receiving a $100,000.00 check from his securities account (Trustee's Exhibit No. 3), which he deposited into the Act 10 account, but denied doing so to

keep the money from the Bank. He admitted that he received money from the Act 10 account when he needed it, but denied doing this to keep the money from the Bank.

The Debtor further admitted he received the funds in the ten Northern Trust checks from Roseland and that he endorsed over three to each of the Defendants, his daughters. He gave the Defendants the checks after he tried to open bank accounts, but was denied because of his credit card problems and the Bank's citation. He advised the Defendants of his inability to open a checking account. They, in turn, agreed to hold the check proceeds for him in their respective accounts. The Debtor further admitted that he did not schedule the income from Roseland on his Schedules or Statement of Financial Affairs. He stated that he used available funds to live on and attempted to salvage Hild rather than pay the Bank's judgment.

The Debtor stated that he had no written agreement with either of the Defendants regarding the checks he endorsed over to them. It was never intended by the Debtor that the Defendants could use the funds for their own purposes. The Debtor testified that he trusted the Defendants to hold the proceeds for him in their accounts, and that they returned the proceeds to him or to others at his directions. The Debtor denied that the arrangement with the Defendants was intended to conceal the funds, opining that had he intended to conceal the money, he would have just cashed the checks.

The Trustee testified that she conducted the 11 U.S.C. § 341 meeting of creditors in this case over two scheduled dates because of the Debtor's lack of cooperation and various questions. During the course of her administration of the bankruptcy estate, she learned that money had been distributed to the Debtor from Roseland in February and June 1999. Those funds were not disclosed on the Debtor's Schedules or Statement of Financial Affairs, nor were the transfers by the Debtor to the Defendants disclosed. Moreover, the Bank was not initially scheduled as a creditor and the Debtor failed to list his interest in and income received from Roseland.

Defendant Ann Greco testified that she has a master's degree and had worked in the business field. She stated that in February 1999, the Debtor told her that he could not open a checking account. However, she did not know why or inquire as to the reason. She did not know if the Debtor had a job at that time or how he supported himself. No one other than the Debtor asked her to hold money in her bank account. She admitted receiving $99,500.00 from Roseland in one check (Trustee's Exhibit No. 20), and knew that her siblings received similar checks. She admitted receiving the Debtor's three checks in the amount of $9,950.00 each, but she never asked the Debtor why he received multiple checks for his distribution. At the time she received the checks from the Debtor, he did not owe her any money. Finally, she testified that she did not believe she could use any of the money from the Debtor for her own purposes.

Defendant Julie Marie Nelmark testified that she graduated from college and started a master's degree program. In addition, she worked in the business field. She stated that she did not know that the Debtor did not have a checking account when he asked her to hold the proceeds of the three checks he endorsed over to her. She further testified that she did not think it was unusual and did not ask him about it. Rather, she deposited the checks in her account. She admitted writing checks, per his directions, including checks to Act 10 and Advantage. *See* Defendants' Ex-

hibit C. At that time, the Debtor did not owe her any money and she believed the funds received from him, which she deposited into her account, belonged to the Debtor. She did not exercise control over the proceeds. She further stated that she never discussed the Debtor's business affairs with him, including his dealings with the Bank.

## IV. *DISCUSSION*

### A. *Count I of the Complaint*

Pursuant to Count I of the complaint, the Trustee seeks turnover of property of the estate pursuant to 11 U.S.C. § 542(a). In particular, the Trustee seeks turnover of the sum of $59,700.00, the total of the six checks, which were transferred from the Debtor to the Defendants. The Trustee seeks turnover of those funds to the bankruptcy estate, plus prejudgment interest. The Defendants contend that they were merely acting as banks and that the Debtor retained control over the subject funds after they were placed into their accounts.

The statutory provision for turnover contained in 11 U.S.C. § 542(a) deals with property of the estate to be turned over to the appropriate party, normally the case trustee, with the exceptions provided in § 542(c) and (d), and subject to set-off rights referenced in § 542(b) pursuant to 11 U.S.C. § 553. Section 542(a) provides in pertinent part:

> (a) Except as provided in subsection (c) or (d) of this section, an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account

for, such property or the value of such property. . . .

11 U.S.C. § 542(a).

Turnover is not intended as a remedy to determine disputed rights of parties to property, rather it is intended as the remedy to obtain what is acknowledged to be property of the bankruptcy estate. *Marlow v. Oakland Gin Co., Inc. (In re Julien Co.)*, 128 B.R. 987 (Bankr. W.D.Tenn.1991), *aff'd*, 44 F.3d 426 (6th Cir.1995). In this case, the Trustee seeks to obtain $59,700.00 in funds transferred by the Debtor to the Defendants.

Relief under § 542(a) is most frequently afforded to case trustees against creditors who are in actual or constructive possession of the subject property and who do not voluntarily surrender it. *See Pileckas v. Marcucio*, 156 B.R. 721 (N.D.N.Y. 1993). Hence, the burden is usually on the trustee seeking turnover, *Groupe v. Hill (In re Hill)*, 156 B.R. 998 (Bankr.N.D.Ill. 1993), and the evidence must show that the asset in question is part of the bankruptcy estate. *Mather v. Tailored Fabrics, Inc. (In re Himes)*, 179 B.R. 279 (Bankr. E.D.Okla.1995); *Orix Credit Alliance, Inc. v. Wojcicki (In re Wojcicki)*, Bankr.No. 97 B 24008, Adv. No. 01286, 1997 WL 742513 (Bankr.N.D.Ill. Dec. 1, 1997). Only property in which the debtor has an interest that properly becomes part of the bankruptcy estate can be made the subject of an order for turnover under § 542(a). *Cates–Harman v. Stage (In re Stage)*, 85 B.R. 880 (Bankr.M.D.Fla.1988). It thus follows that, if the debtor does not have the right to possess or use property at the commencement of a case, a turnover action cannot be a tool to acquire such rights. *Creative Data Forms, Inc. v. Pennsylvania Minority Bus. Dev. Auth. (In re Creative Data Forms, Inc.)*, 41 B.R. 334 (Bankr.E.D.Pa.1984), *aff'd*, 72 B.R. 619 (E.D.Pa.1985), *aff'd*, 800 F.2d 1132 (3d Cir.

1986). Defendants having possession or control of property of the estate must turn it over to the trustee or become liable to the trustee for its value, unless they have disposed of the property without actual notice or knowledge of the bankruptcy case. *In re USA Diversified Prods., Inc.,* 100 F.3d 53, 56–57 (7th Cir.1996). That they no longer have possession or control of the property when turnover is demanded is not, by itself, a defense. *Id.*

The Defendants stipulated that on February 27, 1999, each deposited $29,850.00 from the Debtor into their respective bank accounts. *See* Stipulation at ¶s 24 and 26. Moreover, as of May 12, 1999, the date of the Debtor's bankruptcy petition, Julie Marie Nelmark still had $29,850.00 of the subject funds and Ann Greco still had $19,850.00 of the subject funds after she wrote the Debtor a $10,000.00 check on April 9, 2001. *See* Stipulation at ¶ 30.

The Trustee argues that after the Defendants deposited the six checks in their respective bank accounts, the funds became the property of the account holders, the Defendants, in the absence of any contrary agreement with the depository banks. Alternatively, the Trustee argues that if the Debtor did not transfer the checks to the Defendants, as they argue, then they were merely holding the funds at the time of the filing of the bankruptcy petition, and those funds became part of the estate under 11 U.S.C. § 541, and subject to the turnover requirements of § 542.

▮ Under § 542, property belonging to the Debtor on the date of the bankruptcy petition becomes property of the estate, and is subject to turnover by order of the Court. The Defendants are required to turn over the value of the property regardless of whether they still have the funds in their possession. If, as the Defendants argue, they were merely "acting as banks" for the Debtor, then the subject funds were property of the Debtor's estate as of the date of the filing of the bankruptcy petition. Although the Defendants either returned the proceeds to the Debtor or to others at his direction, this was done without notice to the Trustee, the creditors or the Court, and their lack of possession of the funds does not obviate their liability for the value thereof. The Defendants have not raised any affirmative defense to the Trustee's turnover claim. There are no equitable defenses to a trustee's demand for turnover of estate property other than the defenses enumerated in the statute. *See In re Midway Airlines, Inc.,* 221 B.R. 411, 459 (Bankr.N.D.Ill.1998) (citation omitted). Accordingly, because the Defendants had possession or control over property of the Debtor's estate as of May 12, 1999, each Defendant is hereby ordered to turn over the sum of $29,850.00 to the Trustee.

The Trustee makes a demand for prejudgment interest. She contends it constitutes an element of compensation that corrects for the time value of money in order to make the bankruptcy estate whole and should run from the time this adversary proceeding was filed.

▮ The Bankruptcy Code does not specifically provided for the award of prejudgment interest. It is within the Court's discretion whether to grant prejudgment interest. *See, e.g., Carmel v. River Bank America (In re FBN Food Servs., Inc.),* 175 B.R. 671, 690 (Bankr.N.D.Ill.1994), *aff'd,* 185 B.R. 265 (N.D.Ill.1995), *aff'd in part, remanded in part on other grounds,* 82 F.3d 1387 (7th Cir.1996) (citations omitted). The purpose of allowing prejudgment interest is compensatory, not punitive; such interest is granted to make the prevailing party whole. *See In re Milwaukee Cheese Wis., Inc.,* 112 F.3d 845, 849 (7th Cir.1997). Not only must the award of prejudgment interest be compen-

satory, it is also within the Court's discretion to determine if such award is equitable. *Id.* ("Discretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so."). "Discretion is not, however, authorization to decide who deserves the money more." *Id.* In other words, prejudgment interest is "simply an ingredient of full compensation," and should not be considered a windfall. *In re P.A. Bergner & Co.*, 140 F.3d 1111, 1123 (7th Cir.1998), *cert. denied,* 525 U.S. 964, 119 S.Ct. 409, 142 L.Ed.2d 332 (1998). Prejudgment interest has been awarded pursuant to the rate set forth in 28 U.S.C. § 1961 from the date the adversary proceeding was filed. *See Floyd v. Dunson (In re Rodriguez),* 209 B.R. 424, 434 (Bankr.S.D.Tex.1997); *FBN Food Servs.,* 175 B.R. at 691.

■■ The Court exercises it discretion and awards the Trustee prejudgment interest in order to compensate the bankruptcy estate. The Trustee is entitled to prejudgment interest from the date the adversary proceeding was commenced-December 22, 2000. The parties have stipulated that prejudgment interest from December 22, 2000, through December 22, 2001 totals $1,623.84 with respect to each Defendants' transfer of $29,850.00. *See* Stipulation at ¶ 42. On a daily basis, interest accrues at $4.45 per day for each Defendant. *Id.;* Trustee's Exhibit No. 36. The Court will award prejudgment interest through the date of this Opinion, January 7, 2002, which includes an extra $71.20 payable by each Defendant. Accordingly, the total interest due to the Trustee from each Defendant is $1,695.04.

Hence, the Court grants judgment in favor of the Trustee and against the Defendants under Count I of the complaint. Each Defendant is ordered to turn over the sum of $29,850.00 to the Trustee, plus prejudgment interest of $1,695.04 from December 22, 2000 through January 7, 2002.

## B. Counts II and III of the Complaint

Next, in Count II of the complaint, the Trustee contends that the transfers by the Debtor to the Defendants were made with actual intent to hinder, delay or defraud the Debtor's creditors and constitute fraudulent conveyances. In Count III of the complaint, the Trustee alleges that the transfers were fraudulent because the Debtor received less than reasonably equivalent value in exchange for the transfers; he was insolvent on the date of the transfers or became insolvent as a result of the transfers; he was engaged in business or a transaction for which property remaining with him was unreasonably small capital; or the Debtor intended to incur, or believed that he would incur, debts that would be beyond his ability to pay as such debts matured. Counts II and III of the Trustee's complaint are brought under 11 U.S.C. § 548(a)(1), which provides in relevant part:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, ... that was made ... on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made, ... indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer ...; and

(ii)(I) was insolvent on the date that such transfer was made ..., or became insolvent as a result of such transfer ...;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1).

The cause of action under § 548(a)(1)(A) is commonly referred to as "actual fraud" because of the element of the debtor's actual intention to hinder, delay or defraud creditors. *FBN Food Servs.*, 82 F.3d at 1394. Section 548(a)(1)(B) is often called "constructive fraud" because it omits any element of intent. *Id.* Here, the Trustee alleges actual fraud under § 548(a)(1)(A) in Count II, and constructive fraud under § 548(a)(1)(B) in Count III of the complaint. One decision has described the differences between the two causes of action under § 548(a)(1):

The focus in the inquiry into actual intent is on the state of mind of the debtor. Neither malice nor insolvency are required. Culpability of the part of . . . the transferees is not essential.

Unlike constructively fraudulent transfers, the adequacy or equivalence of consideration provided for the actually fraudulent transfer is not material to the question whether the transfer is actually fraudulent. . . . Conversely, the transferor's intent is immaterial to the constructively fraudulent transfer in which the issue is the equivalence of the consideration coupled with either insolvency, or inadequacy of remaining capital, or inability to pay debts as they mature.

*In re Cohen*, 199 B.R. 709, 716–17 (9th Cir. BAP 1996). "Fraudulent conveyance law protects creditors from last-minute dimi-

nutions of the pool of assets in which they have interests." *Bonded Fin. Servs., Inc. v. European American Bank*, 838 F.2d 890, 892 (7th Cir.1988).

Badges of fraud, the existence of which can be used to infer actual intent to defraud under § 548(a)(1)(A), include the following: (1) absconding with the proceeds of the transfer immediately after their receipt; (2) absence of consideration when the transferor and transferee know that outstanding creditors will not be paid; (3) huge disparity in value between the property transferred and the consideration received; (4) fact that the transferee was an officer, or agent or creditor of an officer of corporate transferor; (5) insolvency of the debtor; and (6) existence of a special relationship between the debtor and the transferee. *FBN Food Servs.*, 185 B.R. at 275.

To obtain relief under § 548(a)(1)(B), the Trustee must establish not only that the transfers were for less than a reasonably equivalent value, but also that the Debtor was insolvent at the time of the transfers or became insolvent as a result of the transfers. *Dunham v. Kisak*, 192 F.3d 1104, 1109 (7th Cir.1999). The Bankruptcy Code uses a balance sheet approach to insolvency. *Steege v. Affiliated Bank/North Shore Nat. (In re Alper-Richman Furs, Ltd.)*, 147 B.R. 140, 154 (Bankr.N.D.Ill.1992). Under that standard, the Court looks to whether a debtor's assets exceeded its liabilities at the time of a challenged transfer. *Id.*

Determination of reasonably equivalent value under § 548(a)(1)(B) is a two-step process. *Anand v. National Republic Bank of Chicago*, 239 B.R. 511, 516–17 (N.D.Ill.1999). The Court must first determine whether the debtor· received value, and then examine whether the value is reasonably equivalent to what the debt-

or gave. *Id.* at 517 (citations omitted). The second inquiry, whether what the debtor gave up was reasonably equivalent to what he received, is more difficult. *Id.*

■■■■ The Bankruptcy Code does not define the term "reasonably equivalent value." Whether "reasonably equivalent value" has been given is a question of fact. *In re Crystal Med. Prods., Inc.*, 240 B.R. 290, 300 (Bankr.N.D.Ill.1999). The factors utilized to determine reasonably equivalent value are: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at an arm's length; and (4) the good faith of the transferee. *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir.1997); *Grigsby v. Carmell (In re Apex Auto. Warehouse, L.P.)*, 238 B.R. 758, 773 (Bankr.N.D.Ill.1999). There is no fixed formula for determining reasonable equivalence, but will depend on all the facts of each case, an important element being fair market value. *Barber*, 129 F.3d at 387. The Seventh Circuit has held that the receipt of funds for a debtor by a transferee and subsequent transfer back to the debtor without consideration paid by the initial transferee lacks reasonably equivalent value. *See In re Carlson*, 263 F.3d 748, 750 (7th Cir.2001). The Trustee bears the burden of proof as to this issue, and as to the other elements of § 548. *FBN Food Servs.*, 175 B.R. at 682.

■■■■ When a transfer is avoided, the next step is to look to 11 U.S.C. § 550(a), which provides that a trustee may recover "the property transferred, or, if the court so orders, the value of such property . . . ." 11 U.S.C. § 550(a)(1); *see also FBN Food Servs.*, 82 F.3d at 1396. Once the whole transfer is pulled into the estate, the money is then distributed according to the priorities under the Bank-

ruptcy Code and the debtor's own commitments. *Id.* Although the general rule is that transferees must either return the property or pay its value, there are exceptions under § 548(c) and § 550(b). *Cohen*, 199 B.R. at 719. Where, as here, recovery is sought from the initial transferee of property, only the defense under § 548(c) is potentially available. *See Thompson v. Jonovich (In re Food & Fibre Protection, Ltd.)*, 168 B.R. 408, 419–20 (Bankr.D.Ariz. 1994) (defense under § 550(b) is unavailable to "initial transferee"); *Bucki v. Singleton (In re Cardon Realty Corp.)*, 146 B.R. 72, 79 n. 11 (Bankr.W.D.N.Y.1992) (same). Section 548(c) can be used to shelter payments from the Trustee's avoiding power and provides:

> (c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c). There are two prongs to the defense under § 548(c)—value and good faith. This section has been construed as an affirmative defense, all elements of which must be proven by the transferee. *Breeden v. L.I. Bridge Fund, LLC (In re The Bennett Funding Group, Inc.)* 232 B.R. 565, 573 (Bankr.N.D.N.Y. 1999) (citation omitted).

■■■■ The Bankruptcy Code defines "value" for purposes of § 548(c) as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ." 11 U.S.C. § 548(d)(2)(A). The Bankruptcy Code does not define "good faith," a term which is not susceptible of precise defini-

tion and which is generally determined on a case-by-case basis. *Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 878 (Bankr.N.D.Ill.2000) (citation omitted). Good faith has been construed as having an objective component. *Id.* (citation omitted). With respect to good faith, courts agree that if a transferee reasonably should have known of a debtor's insolvency or of the fraudulent intent underlying a transfer, the transferee is not entitled to the defense under § 548(c). *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995); *In re M & L Bus. Mach. Co., Inc. v. McKay*, 84 F.3d 1330, 1336 (10th Cir.), *cert. denied*, 519 U.S. 1040, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996). The Defendants bear the burden of proof on the defense under § 548(c). *Lake States*, 253 B.R. at 879 (citations omitted).

■ First, the Court must address the Defendants' argument that no transfer occurred for purposes of § 548(a)(1) because the Debtor retained an interest in the funds and the Defendants did not maintain dominion over the funds or have the right to use the money for their own purposes, and were acting as "banks" for the Debtor or financial intermediaries disbursing the collected funds from the check proceeds at his direction. The Defendants cite *Bonded Fin. Servs.*, 838 F.2d 890 (7th Cir.1988) in support of their position. The Court finds that the Debtor's endorsement of the six checks and the delivery of them to the Defendants constitutes a transfer under § 548(a)(1). The Bankruptcy Code defines "transfer" broadly and includes "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property...." 11 U.S.C. § 101(54).

The Court rejects this argument and finds that the facts in this matter are distinguishable from those in *Bonded.*

The *Bonded* case involved a bank, which was not an insider like the two Defendants, who are the Debtor's daughters. The court in *Bonded* defined "transferee" as one who had "dominion over the money or other asset, the right to put the money to one's own purposes." 838 F.2d at 893. Under this definition, the Defendants were transferees of the six checks delivered to them by the Debtor. Each check was a negotiable instrument under the Illinois version of the Uniform Commercial Code. *See* 810 ILCS 5/3–203, 5/3–104, 5/3–109 and 5/3–204. The Debtor was the sole payee of each check and it is undisputed that he endorsed all of them. At that point, each check was bearer paper and could be further negotiated by whomever he gave the checks. It is undisputed that the Debtor gave the checks to the Defendants who, in turn, endorsed the checks and then deposited them into their checking accounts. The Debtor was not a party signatory on the Defendants' accounts and had no authority to withdraw any of the funds. The Defendants had control over the checking account proceeds because they were the authorized signatories on the accounts in which the checks were deposited, not the Debtor. The Defendants, in fact, possessed the right to put the money to their own use. That the Defendants acted in accord with the Debtor's directions, and did not utilize the proceeds for their own benefit, does not insulate them from liability as initial transferees of the checks, or establish that, as a matter of law, they lacked control over the accounts. Their subjective beliefs do not override the undisputed fact that they had the authority to withdraw the funds for their own purposes. Hence, the Court rejects the Defendants' argument that they were not transferees and there was no transfer by the Debtor.

■ The Court holds that the Trustee has established the requisite elements under § 548(a)(1)(A). The Debtor made transfers of interests in property of the estate within one year of the filing of the bankruptcy petition. The transfers were made on February 27, 1999 and the Debtor filed the bankruptcy case on May 12, 1999. Moreover, the Defendants do not dispute that the Debtor was insolvent within the meaning of the Bankruptcy Code before, during and after the transfers to the Defendants. *See* Stipulation at ¶ 41. Further, the parties stipulated that the Defendants are insiders of the Debtor. *Id.* at ¶ 40. Finally, the Court concludes that the Debtor's actions were taken with the purpose of, at least, hindering and delaying the Bank in its efforts to collect the judgment rendered by the state court, if not to defraud the Bank and evade its citation lien by placing the six checks which he endorsed and delivered over to his daughters in their actual possession. As counsel for the Trustee persuasively argued, this is a classic example of a debtor engaging in fraudulent transfers by placing assets in the names of insiders, under his control or direction, to frustrate the enforcement of a judgment of another creditor whose claim he did not want to pay.

The Court further notes that the fact that each of the six checks was, at the Debtor's request, issued in an amount just under the $10,000.00 limit for which a depositary bank would have to report a large currency transfer to the appropriate financial governmental regulatory body (31 U.S.C. §§ 5311, 5313(a) and 5322), had the further effect of bringing each of the transferred checks below the proverbial radar screens of such governmental regulators and thus evade notice and observation as unusual transactions.

The Court finds that the transactions with the Defendants are tainted with several badges of fraud: (1) the transfers were to "insiders"—the Debtor's daughters; (2) according to the Defendants, the Debtor retained control of the funds after the transfers; (3) the transfers were concealed and not disclosed on the Debtor's Schedules or Statement of Financial Affairs; (4) prior to the transfers, the Debtor had been sued by the Bank; (5) the Debtor never voluntarily disclosed that he had concealed, removed and spent the proceeds disbursed from Roseland to him, which were bankruptcy estate assets; (6) the Defendants gave no consideration to the Debtor for the $59,700.00 they received from him; (7) the Debtor was insolvent at the time he gave the checks to the Defendants; (8) the checks were delivered to the Defendants after the Bank had been awarded a substantial judgment against the Debtor and had engaged in post-judgment collection efforts against the Debtor; and (9) portions of the check proceeds were later funneled by the Defendants to other insider corporations which were controlled by the Debtor.

Notwithstanding the presence of these badges of fraud, the Defendants counter that because the Debtor revealed the transfers at the creditors' meeting, his failure to schedule or list the transfers is some how negated. Moreover, they contend that because the Debtor subsequently spent most of the returned proceeds on maintaining his home and boat, he effectively preserved assets of the bankruptcy estate. The short answer to these arguments is that those facts do not obviate that the Debtor, at the very least, intended to delay and hinder the Bank in its collection efforts against him. Consequently, the Court concludes that the Trustee has established all elements under § 548(a)(1)(A).

Next, the Court holds that the Trustee has established the necessary elements un-

der § 548(a)(1)(B). The parties have stipulated that the Debtor was insolvent at the time of the transfers or became insolvent after the transfers. Moreover, the Court finds that the Debtor did not receive any value for the transfers he made to the Defendants. The subsequent transfers of the proceeds to either the Debtor or to others at his direction do not change the fact that neither Defendant gave the Debtor anything of reasonably equivalent value at the time they received the checks. The Debtor's subsequent use of the proceeds principally benefitted him while he continued to occupy the home and have the use of the boat, and did not benefit or preserve the bankruptcy estate. The Defendants did not give the Debtor any consideration or value for the transfers. Rather, they disbursed the proceeds as the Debtor directed, thereby effectively preferring other creditors and diverting those proceeds from the Bank. Thus, the Trustee has demonstrated the necessary elements under § 548(a)(1)(B).

The Defendants argue that, pursuant to § 548(c), they acted in good faith and gave value to the Debtor when they either returned the proceeds to him or disbursed them at his direction. The Court holds that the Defendants do not meet the requirements of § 548(c). First, the Defendants failed to act in good faith for the following reasons: (1) the Debtor told them he had been served with the Bank's citation; (2) Defendant Julie Nelmark knew that the Debtor still owed Defendant Barbara Roti unsatisfied obligations under a separation agreement and marital dissolution judgment; (3) both Defendants knew the Debtor had received multiple checks for the Roseland distributions, in contrast to the single check each Defendant received; (4) the Debtor told the Defendants that he had no checking account and could not open one because of his credit problems; and (5) the Debtor requested the Defendants to act at his direction in depositing the checks and making subsequent withdrawals of the proceeds.

The Court concludes that the Defendants lacked good faith because they ignored facts which would put a reasonable person on inquiry of the Debtor's purpose and would "excite the suspicions" of a prudent person or "lead a person of ordinary perception to infer fraud." *See Alan Drey Co., Inc. v. Generation, Inc.,* 22 Ill.App.3d 611, 619, 317 N.E.2d 673, 680 (1974); *M & L Bus. Mach.,* 84 F.3d at 1338; *In re Harbour,* 845 F.2d 1254, 1258 (4th Cir. 1988). Both Defendants were highly educated and their suspicions should have been aroused when the Debtor informed them that he was unable to open a checking account. The Court finds it incredible that neither Defendant asked the Debtor why he was unable to open a checking account, in light of their education, experience and knowledge of his dispute with the Bank.

The Court finds that the Defendants knew of the Debtor's financial problems and were parties to his scheme of hindering and delaying the Bank in its efforts, even if they acted with the best of intentions to help the Debtor. They were not wholly ignorant of his situation and do not meet the good faith required standard. They never held any money for the Debtor before and their actions effectively aided and abetted the Debtor in his scheme to thwart the Bank in its legitimate exercise of its state court remedies and judgment. By accommodating the Debtor's requests of them, the Defendants, perhaps unwittingly, but in a very real way, assisted him in keeping the money away from the Bank. Because they were aware of the Debtor's ongoing litigation with the Bank and his

financial problems, the Defendants failed to take the transfers in good faith.

Moreover, the Court finds that the Defendants did not take the transfers for "value." The Court rejects the Defendants' argument that the bankruptcy estate benefitted because the Debtor utilized the funds he transferred to the Defendants to pay his personal expenses and maintain assets of the estate. This does not constitute "value" from the Defendants. Moreover, courts have denied use of the § 548(c) shelter to defendants who were not able to establish "reasonably equivalent value" for purposes of § 548(a)(1)(B). *See Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 442 (Bankr. N.D.Ill.1995). Based on this reasoning, the § 548(c) shelter is not available to the Defendants in this case because the Court has found that they gave no "value" to the Debtor for purposes of finding a "reasonably equivalent value" under § 548(a)(1)(B). Thus, the Defendants failed to establish the requisite elements for a defense under § 548(c).

The Defendants urge the Court to exercise its equitable discretion under § 550(a) and refrain from entering judgment against them because they did not personally retain or benefit from any of the check proceeds. They contend that a judgment against them would obligate them to repay the estate out of their own personal funds and that they are not "bad faith transferees" who materially assisted in or enabled the transferring of funds and they derived no demonstrable benefit therefrom. While the Court agrees that the evidence fails to show that the Defendants derived some clear demonstrable benefit from the deposits made to their accounts or used the proceeds for their own benefits, it is clear that they had control over the check proceeds while in their accounts, which they could have uti-

lized. Moreover, no dispute exists regarding their actions in banking the check proceeds for the Debtor, which enabled him to further conceal what he had done and effectively stymy the Bank's ongoing collection efforts in violation of the state court citation proceeding. The Court finds that the Defendants did not take the transfers in good faith. Thus, it will not exercise its discretion and refrain from entering judgment against them.

Therefore, the Court enters judgment in favor of the Trustee and against Defendants Julie Marie Nelmark and Ann Greco under Counts II and III of the complaint. The Court holds that the transfers made by the Debtor to the Defendants were fraudulent pursuant to § 548(a)(1)(A) and § 548(a)(1)(B). Under § 550(a)(1), the Trustee may recover those transfers in the sum of $29,850.00 from each Defendant for the benefit of the Debtor's estate, plus prejudgment interest of $1,695.04 from December 22, 2000 through January 7, 2002.

### C. *Counts IV and V of the Complaint*

Next, in Count IV of the complaint, the Trustee contends that the transfers by the Debtor to the Defendants were made with actual intent to hinder, delay or defraud the Debtor's creditors and constitute fraudulent transfers pursuant to the Illinois Uniform Fraudulent Transfers Act, 740 ILCS 160/5(a)(1). In Count V of the complaint, the Trustee alleges that the transfers were fraudulent under 740 ILCS 160/5(a)(2) because the Debtor received less than reasonably equivalent value in exchange for the transfers and he was engaged in business or a transaction for which property remaining with him was unreasonably small capital, or the Debtor intended to incur or believed that he would incur, debts that would be beyond his ability to pay as such debts matured.

The Trustee seeks to avoid the subject transfers of property from the Debtor to the Defendants pursuant to 11 U.S.C. § 544(b)(1) which provides in pertinent part:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1) (emphasis supplied). Furthermore, if transfers are avoidable under § 544(b)(1), they can be recovered under 11 U.S.C. § 550 from, among others, "the entity for whose benefit such transfer was made." See 11 U.S.C. § 550(a)(1).

■■■ In a case under § 544(b)(1), the Trustee has the rights of an unsecured creditor to avoid transactions that can be avoided by such creditor under state law. 11 U.S.C. § 544(b)(1); *In re Image Worldwide, Ltd.*, 139 F.3d 574, 576–77 (7th Cir. 1998). The Trustee need not identify the creditor, so long as an unsecured creditor exists. *Id.* at 577; *In re Leonard*, 125 F.3d 543, 544 (7th Cir.1997). The transaction can be avoided completely even if the Trustee cannot produce creditors whose liens total more that the value of the property. *Id.* at 544–45, but the Trustee has done so in this matter by providing the Court with evidence that the Bank is a creditor of the Debtor with a potentially allowable claim under § 502.

The applicable state law asserted by the Trustee under § 544(b)(1) is the Illinois Uniform Fraudulent Transfers Act, 740 ILCS 160/1 *et seq.* (the "UFTA"). The relevant portions of the UFTA provide:

§ 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a).

Sections 5 and 6 of the UFTA are analogous to 11 U.S.C. § 548(a)(1) and (2).[2] *See Scholes v. Lehmann*, 56 F.3d 750, 756 (7th Cir.), *cert. denied sub nom. African Enter., Inc. v. Scholes*, 516 U.S. 1028, 116 S.Ct. 673, 133 L.Ed.2d 522 (1995). "Because the provisions of the UFTA parallel § 548 of the Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the UFTA." *Levit v. Spatz (In re Spatz)*, 222 B.R. 157, 164 (N.D.Ill.1998) (citation omitted); *see also Image Worldwide*, 139 F.3d at 577 (because the Illinois UFTA is a uniform act which derived phrases from § 548 the court may look to cases under § 548 and

---

**2.** An important difference between § 548 and the UFTA is that § 548 authorizes avoidance of transfers made within one year before the bankruptcy filing. 11 U.S.C. § 548(a). Causes of action for fraudulent conveyances can be brought under the UFTA, however, within four years after the transfer was made. 740 ILCS 160/10(a).

other cases interpreting other states' versions of the UFTA for assistance).

Pursuant to § 5 of the UFTA, the Trustee may recover the transfer made by the Debtor under two theories: (1) if the Debtor made the transfer with actual intent to defraud a creditor; or (2) if the Debtor did not receive reasonably equivalent value in exchange for the transfer and was insolvent at the time of the transfer or became insolvent as a result of the transfer. The UFTA speaks to two types of fraud—"fraud in fact" and "fraud in law." *Scholes*, 56 F.3d at 756–57.

 "Fraud in fact" or actual fraud pursuant to § 5(a)(1) of the UFTA occurs when a debtor transfers property with the intent to hinder, delay or defraud his creditors. *Bay State Milling Co. v. Martin (In re Martin)*, 145 B.R. 933, 946 (Bankr. N.D.Ill.1992), *appeal dismissed*, 151 B.R. 154 (N.D.Ill.1993). The moving party must prove a specific intent to hinder, delay or defraud. *Lindholm v. Holtz*, 221 Ill.App.3d 330, 334, 163 Ill.Dec. 706, 581 N.E.2d 860, 863 (1991) (citing *Gendron v. Chicago & North Western Transp. Co.*, 139 Ill.2d 422, 437, 151 Ill.Dec. 545, 564 N.E.2d 1207, 1214–15 (1990)). The Trustee has the burden of proving all elements of actual fraud under Illinois law by clear and convincing evidence. *Martin*, 145 B.R. at 946 (citation omitted); *Ray v. Winter*, 67 Ill.2d 296, 304, 10 Ill.Dec. 225, 367 N.E.2d 678, 682 (1977). While a transfer between family members is not proof *per se* of fraudulent intent, a familial relationship is weighty proof of such intent. *Berland v. Mussa (In re Mussa)*, 215 B.R. 158, 168 (Bankr.N.D.Ill.1997) (*citing Reisch v. Bowie*, 367 Ill. 126, 132, 10 N.E.2d 663 (1937) ("In particular, if a voluntary conveyance from a parent to a child results in hindering or delaying creditors, it will be regarded as fraudulent in law, irrespective of the honesty of the grantor's motives.")).

In determining whether a transfer is made with actual intent to defraud, the UFTA sets forth several factors—also known as the "badges of fraud"—from which an inference of fraudulent intent may be drawn. Section 5(b) of the UFTA sets forth the following indicia:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

740 ILCS 160/5(b).

 When these "badges of fraud" are present in sufficient number, it may give rise to an inference or presumption of fraud. *Steel Co. v. Morgan Marshall Indus., Inc.*, 278 Ill.App.3d 241, 251, 214 Ill.Dec. 1029, 662 N.E.2d 595, 602 (1996)

(citation omitted). Under the Federal Rules of Evidence, "a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast." Fed.R.Evid. 301. The presence of seven badges of fraud have been held sufficient to raise a presumption of fraudulent intent. *See Mussa*, 215 B.R. at 170.

■ Full consideration for the transfer is not, as a matter of law, an absolute defense to fraud in fact. · *In re Spatz*, 222 B.R. at 169. As such, if the moving party proves fraudulent intent, then explicitly the transfer is deemed fraudulent, even if it is in exchange for valuable or full consideration. *Id.*

The UFTA expressly provides a defense to fraud in fact under § 9(a) which provides:

> (a) A transfer or obligation is not voidable under paragraph (1) of subsection (a) of Section 5 against a person who took in *good faith and for a reasonably equivalent value* or against an subsequent transferee or obligee.

740 ILCS § 160/9(a) (emphasis supplied). Courts have recognized that a defense under § 9 of the UFTA consists of two elements: good faith and reasonably equivalent value. *See Spatz*, 222 B.R. at 168 (citations omitted); *Kennedy v. Four Boys Labor Serv., Inc.*, 279 Ill.App.3d 361, 370, 216 Ill.Dec. 160, 664 N.E.2d 1088, 1093 (1996).

■ Under § 5(a)(2) of the UFTA, "fraud in law," on the other hand, does not require any showing of fraudulent intent. *Scholes*, 56 F.3d at 757; *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir.1997). Be-

cause of its nature, the conveyance is deemed constructively fraudulent. *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 257 B.R. 253, 268 (Bankr.N.D.Ill.2001). The Trustee has the burden of proving fraud in law by a preponderance of the evidence. *See Martin*, 145 B.R. at 946 (citations omitted). A different standard of proof applies to this theory because intent to defraud is presumed when the elements of constructive fraud are established. *Id.* (citations omitted).

■ In order to establish that a conveyance is fraudulent in law, four elements must be present: (1) the debtor made a voluntary transfer; (2) at the time of the transfer, the debtor had incurred obligations elsewhere; (3) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer; and (4) after the transfer, the debtor failed to retain sufficient property to pay the indebtedness. *Lease Resolution*, 128 F.3d at 1079 (citations omitted).

■ The distinction between "fraud in fact" and "fraud in law" cases is derived from whether or not there was any consideration for the conveyance under attack. *Second Nat'l Bank of Robinson v. Jones*, 309 Ill.App. 358, 365, 33 N.E.2d 732, 736 (1941). Lack of consideration or inadequate consideration for a debtor's conveyance, coupled with the existence or prospect of other unpaid creditors, triggers the "fraud in law" theory in which intent to hinder, delay or defraud is presumed from the circumstances. *See Capitol Indem. Corp. v. Keller*, 717 F.2d 324, 327 (7th Cir.1983); *Wilkey v. Wax*, 82 Ill.App.2d 67, 70, 225 N.E.2d 813, 814 (1967). When the natural consequences of the transfer is to harm creditors, the law constructively and conclusively presumes fraudulent intent irrespective of the debtor's actual intent. *Gendron*, 139 Ill.2d at 438, 151 Ill.Dec. 545, 564 N.E.2d at 1215.

What constitutes "reasonably equivalent value" for purposes of the UFTA has not been defined by Illinois case law.[3] The Illinois Supreme Court, in discussing a prior statute, has stated that one of the necessary elements to establish a fraudulent conveyance is that "there must be a transfer made for no or inadequate consideration." *Gendron*, 139 Ill.2d at 438, 564 N.E.2d at 1215 (citations omitted). The Illinois Appellate Court has since implied that there is no "reasonably equivalent value" when there is "no or inadequate consideration." *Regan v. Ivanelli*, 246 Ill. App.3d 798, 805, 187 Ill.Dec. 351, 617 N.E.2d 808, 814 (1993); *see also Image Worldwide*, 139 F.3d at 577 (discussing Illinois interpretation of "reasonably equivalent value").

In determining whether reasonably equivalent value was received under the UFTA, courts should consider how that phrase has been construed under the Bankruptcy Code. *Image Worldwide*, 139 F.3d at 577. The Bankruptcy Code does not define the term "reasonably equivalent value." Whether "reasonably equivalent value" has been given is a question of fact. *Joy Recovery*, 257 B.R. at 268; *Crystal Med. Prods.*, 240 B.R. at 300. The factors utilized to determine reasonably equivalent value are: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at an arm's length; and (4) the good faith of the transferee. *Barber*, 129 F.3d at 387; *Apex Auto. Warehouse*, 238 B.R. at 773. There is no fixed formula for determining reasonable equivalence, but will depend on all the facts of each case, an important element

being fair market value. *Barber*, 129 F.3d at 387.

■ For the same reasons articulated with respect to § 548(a)(1)(A) and § 548(a)(1)(B), the Court holds that the Trustee established the requisite elements under § 160/5(a)(1) and § 160/5(a)(2).

The Court finds that the Debtor intended to hinder or delay the Bank in its collection efforts under § 160/5(a)(1). At this point, it is helpful to analyze the evidence in terms of the eleven "badges of fraud," many of which are present: (1) the parties stipulated that the transfers were to insiders—the Debtor's daughters; (2) the Defendants contend that the Debtor retained control over those funds once deposited into their accounts; (3) the transfers were not disclosed by the Debtor in his Schedules of Statement of Financial Affairs; (4) the Bank had sued the Debtor and was attempting to collect on its judgment when the Debtor made the transfers; (5) the transfers were not of substantially all of the Debtor's assets—he owned a home and boat worth approximately $330,000 and $180,000 respectively (Trustee's Exhibit No. 26); (6) the Debtor did not abscond; (7) the Debtor removed the $99,500.00 he received from Roseland by transferring a portion of it to the Defendants; (8) the Debtor did not receive a reasonably equivalent value for the transfers;[4] (9) the parties stipulated that the Debtor was insolvent at the time of the transfers or became insolvent after the transfers; (10) the transfers occurred shortly after a substantial judgment was entered against the Debtor; and (11) there was no evidence adduced to show that the Debtor transferred the essential assets of

---

3. 740 ILCS 160/4(b) sets forth a definition for "reasonably equivalent value" that does not apply to this matter.

4. The Court previously rejected the argument that payment of the Debtor's personal expenses and maintenance of his home and boat constituted value.

the business to a lienor. The Court finds that a sufficient number of the "badges of fraud" exists to give rise to an inference of the Debtor's intent to hinder or delay the Bank. Hence, the Court holds that the Trustee has proven a cause of action under § 160/5(a)(1).

In addition, the Court finds that the Trustee has met all of the elements to establish a cause of action under § 160/5(a)(2). The Debtor made voluntary transfers to the Defendants. At the time of the transfers, he had incurred a judgment debt from the Bank. Moreover, the Debtor made the transfers to the Defendants without receiving a reasonably equivalent value. Finally, after the transfers, the Debtor failed to retain sufficient property to pay the debt to the Bank. Consequently, the Court holds that the transfers were also constructively fraudulent.

The Defendants assert a defense to the fraudulent transfers under § 9(a) of the UFTA. For the reasons articulated with respect to the defense under § 548(c), the Court holds that the Defendants do not meet the requirements of good faith and reasonably equivalent value.

Accordingly, the Court enters judgment in favor of the Trustee and against each Defendant pursuant to Counts IV and V of the complaint. The Court holds that the transfers from the Debtor to the Defendants were fraudulent under § 160/5(a)(1) and § 160/5(a)(2) of the UFTA. Pursuant to § 544(b)(1), the Trustee may recover those transfers in the sum of $29,850.00 from each Defendant for the benefit of the Debtor's estate, plus prejudgment interest of $1,695.04 from each Defendant from December 22, 2000 through January 7, 2002.

### D. Count VI of the Complaint

Lastly, under Count VI of the complaint, the Trustee seeks to avoid the transfers to the Defendants pursuant to § 160/6(a) of the UFTA. The Trustee contends that the Debtor received less than reasonably equivalent value in exchange for each transfers and was insolvent at the time of the transfers or became insolvent as a result of the transfers. Section 160/6(a) of the UFTA provides:

> § 6. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 ILCS 160/6(a).

Under § 6(a) of the UFTA, the elements of the cause of action are: (1) the creditor's claim arose before the transfer; (2) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transferred property; and (3) the debtor either was insolvent at the time of the transfer or became insolvent as a result of the transfer. *See Joy Recovery*, 257 B.R. at 271; *In re Liquidation of MedCare HMO, Inc.*, 294 Ill.App.3d 42, 50, 228 Ill.Dec. 502, 689 N.E.2d 374, 380 (1997); *Falcon v. Thomas*, 258 Ill.App.3d 900, 909, 196 Ill.Dec. 244, 629 N.E.2d 789, 795 (1994). Actual insolvency is not required. 258 Ill.App.3d at 911, 196 Ill.Dec. 244, 629 N.E.2d at 796. The test is whether the conveyance directly tended to or did impair rights of existing creditors. *Id.* (citation omitted). One difference between § 160/6 of the UFTA and § 160/5 is that § 160/6 includes the requirement that a creditor who has the right to assert some claim must have a

claim that arose before the alleged fraudulent transaction. *See* 740 ILCS 160/6(a).

 The Court finds that the Trustee has demonstrated all of the requisite elements. First, the Trustee has shown, and the Debtor does not dispute, that a creditor who has a right to assert some claim has a claim that arose before the alleged fraudulent transactions. The Bank's claim arose prior to November 6, 1996, the date it filed a lawsuit against the Debtor. *See* Stipulation at ¶ 6. The transfers at issue were made on February 27, 1999. Second, as previously discussed, the Trustee established that the Debtor made the transfers without receiving a reasonably equivalent value in exchange for the transferred property. Finally, the parties stipulated that the Debtor was insolvent at the time of the transfers or became insolvent as a result of the transfers. *See* Stipulation at ¶ 41. Therefore, the Trustee established a cause of action under § 160/6(a) of the UFTA.

Accordingly, the Court enters judgment in favor of the Trustee and against each Defendant under Count VI of the complaint. The Court holds that the transfers from the Debtor to the Defendants were fraudulent under § 160/6(a) of the UFTA. Pursuant to § 544(b)(1), the Trustee may recover those transfers in the amount of $29,850.00 from each Defendant for the benefit of the Debtor's estate, plus prejudgment interest of $1,695.04 from each Defendant from December 22, 2000 through January 7, 2002.

## V. CONCLUSION

For the foregoing reasons, the Court grants judgment in favor of the Trustee and against Defendants Julie Marie Nelmark and Ann Greco pursuant to Count I of the complaint. Each Defendant is ordered under § 542 to turn over to the Trustee the sum of $29,850.00, plus prejudgment interest of $1,695.04 from December 22, 2000 through January 7, 2002. In addition, the Court enters judgment in favor of the Trustee and against Defendants Julie Marie Nelmark and Ann Greco under Counts II and III of the complaint. The Court holds that the transfers made by the Debtor to the Defendants were fraudulent pursuant to § 548(a)(1)(A) and § 548(a)(1)(B). Under § 550(a)(1), the Trustee may recover those transfers in the sum of $29,850.00 from each Defendant for the benefit of the Debtor's estate, plus prejudgment interest of $1,695.04 from December 22, 2000 through January 7, 2002. Finally, the Court enters judgment in favor of the Trustee and against Defendants Julie Marie Nelmark and Ann Greco under Counts IV, V and VI of the complaint. The Court holds that the transfers from the Debtor to the Defendants were fraudulent pursuant to §§ 160/5(a)(1), 160/5(a)(2) and 160/6(a) of the UFTA. Under § 544(b)(1), the Trustee may recover those transfers in the sum of $29,850.00 from each Defendant for the benefit of the Debtor's estate, plus prejudgment interest of $1,695.04 from December 22, 2000 through January 7, 2002.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.