In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2902

In re:  Dennis E. Carlson,

Debtor-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 6021--Marvin E. Aspen, Chief Judge.

Argued March 27, 2001--Decided August 31, 2001


   Before Bauer, Posner, and Manion, Circuit
Judges.

   Posner, Circuit Judge.  The debtor in
this bankruptcy case appeals from the
denial of a discharge of his debts, the
usual relief sought by the debtor in a
bankruptcy proceeding. The grounds for
the denial were various and abundant,
resulting in suspension of the debtor (a
personal-injury lawyer) from the practice
of law--he was lucky to escape criminal
prosecution for bankruptcy fraud. The
only ground we need discuss is whether he
concealed from the trustee in bankruptcy
and improperly transferred property of
the estate in bankruptcy, in violation of
11 U.S.C. sec. 727(a)(4)(A). Carlson's
challenges to the jurisdiction of the
bankruptcy court are frivolous--and if
they succeeded would deprive him of the
relief he seeks, which is a discharge by
the bankruptcy court!

   A few months before declaring
bankruptcy, Carlson formed with his
friend and fellow attorney William
Hourigan what they called a "practice
merger agreement" purporting to merge
their two practices and entitle Hourigan
to a share of the fees in cases that
Carlson assigned him to handle. Shortly
after the formation of the agreement, the
defendant in a case that Carlson was
handling for a person named Gonzalez
agreed to settle the case for $58,000, to
which Carlson under his retention
agreement would be entitled to one-third.
A few weeks later, before Carlson
received the check from the defendant for
the $58,000, he declared bankruptcy, and

a few days later the check came--to Hourigan, who after paying the client's share deposited the balance in his own bank account but in the following months paid out this balance to Carlson and Carlson's designees, in particular Carlson's ex-wife. Carlson did not list the fee from Gonzalez in the schedule of assets that he filed with the bankruptcy court. His position was and is that the expectation of a contingent fee is not property under the law of Illinois and so doesn't have to be listed. He relies on a case which holds that such an expectation is not part of the marital estate in divorce, In re Marriage of Zells, 572 N.E.2d 944, 945 (Ill. 1991); on the client's interest in preserving his lawyer's incentive to press the client's claim with utmost vigor; and on the "practice merger agreement," under which, he argues, Hourigan was entitled to the fee.

The last argument is the very weakest. The agreement did not obligate Carlson to assign any specific cases to Hourigan, let alone one in which all the work had been done and all that remained was to cash a check and disburse two-thirds of the proceeds to the client. And anyway the agreement was obviously made in contemplation of impending bankruptcy and was a transparent effort to conceal assets from the bankruptcy court. It was, therefore--to the extent if any that it actually purported to transfer any of Carlson's already earned fees to Hourigan--a transfer made without consideration and with intent to defraud Carlson's creditors, and thus a fraudulent conveyance and indeed one involving both constructive and actual fraud. 11 U.S.C. sec.sec. 548(a)(1), (a)(2); McClellan v. Cantrell, 217 F.3d 890, 894- 95 (7th Cir. 2000); In re FBN Food Services, Inc., 82 F.3d 1387, 1395 (7th Cir. 1996); Capitol Indemnity Corp. v. Keller, 717 F.2d 324, 327 (7th Cir. 1983); Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979, 989 (2d Cir. 1981).

A more substantial question is whether a merely potential contingent fee is property. The Bankruptcy Code requires the debtor to list as assets of the estate in bankruptcy "all legal or equitable interests of the debtor in property as of the commencement of the

case." 11 U.S.C. sec. 541(a). The term "legal or equitable interests . . . in property" has been broadly interpreted to include any legally enforceable right, United States v. Whiting Pools, Inc., 462 U.S. 198, 204-05, 209 (1983); Cable v. Ivy Tech State College, 200 F.3d 467, 472-73 (7th Cir. 1999); In re Jones, 768 F.2d 923, 926 (7th Cir. 1985); In re Parsons, 262 B.R. 475, 480 (8th Cir. B.A.P. 2001), except (so far as bears on this case), as the statute goes on to state, "earnings from services performed by an individual debtor after the commencement" of the bankruptcy proceeding. 11 U.S.C. sec. 541(a)(6). That a lawyer has a legally enforceable interest in a potential contingent fee is shown by the fact that if the client terminates his employment before judgment or settlement (for reasons other than wrongful conduct by the lawyer) and so before the lawyer receives any fee, he is entitled to the fair value of the services that he performed up to the termination. Estate of Callahan, 578 N.E.2d 985, 988 (Ill. 1991); Storm & Associates, Ltd. v. Cuculich, 700 N.E.2d 202, 208 (Ill. App. 1998); Kenseth v.Commissioner, No. 00-3705, 2001 WL 881479, at *1 (7th Cir. Aug. 7, 2001); Maksym v. Loesch, 937 F.2d 1237, 1245 (7th Cir. 1991); Skeens v. Miller, 628 A.2d 185, 188 (Md. 1993); Tillman v. Komar, 181 N.E. 75 (N.Y. 1932). This is true even if he withdraws rather than being terminated, provided the withdrawal is for good cause. Kannewurf v. Johns, 632 N.E.2d 711, 716 (Ill. App. 1994); Leoris & Cohen, P.C. v. McNiece, 589 N.E.2d 1060, 1064-65 (Ill. App. 1992); Reed Yates Farms, Inc. v. Yates, 526 N.E.2d 1115, 1124-25 (Ill. App. 1988); International Materials Corp. v. Sun Corp., 824 S.W.2d 890, 894 (Mo. 1992). It follows that the fair value of the services rendered by a contingent-fee lawyer up to the date of his bankruptcy (though not after, by virtue of section 541(a)(6)) is property of his estate in bankruptcy. In re Jess, 169 F.3d 1204, 1207 (9th Cir. 1999); Turner v. Avery, 947 F.2d 772, 774 (5th Cir. 1991).

But because the property interests that bankruptcy enforces are property interests created by state law, Barnhill v. Johnson, 503 U.S. 393, 398 (1992); Butner v. United States, 440 U.S. 48, 55 (1979); In re Krueger, 192 F.3d 733, 737

(7th Cir. 1999), we must consider whether, as Carlson argues, the decision of the Supreme Court of Illinois in In re Marriage of Zells, supra, creates a different rule for Illinois regarding the interest in a potential contingent fee. It does not. The cases we cited in the preceding paragraph show that in Illinois as in other states the lawyer whose employment ends before the litigation is complete is (with the usual exceptions) entitled to the fair value of his services up to the date of termination. All that Zells holds is that because the value of the potential contingent fee is uncertain, it is not to be part of the marital estate. The court did express concern that if the potential contingent fee were property of the marital estate the lawyer would be in effect splitting the fee with a nonlawyer, his spouse (unless the spouse happened to be a lawyer), which is forbidden. This does not mean that the potential contingent fee is not property under Illinois law, however--an issue not discussed in Zells. It means only that the Illinois courts don't think it should be subjected to the control or influence of a nonlawyer. That may be right or wrong (which isn't our business), but it does not rule the status of the potential contingent fee in bankruptcy. Illinois has not declared potential contingent fees not to be property. Nor has it purported to exempt them from bankruptcy under 11 U.S.C. sec. 522(b). To prevent debilitating uncertainty regarding creditors' rights in bankruptcy, the courts require that state exemptions from federal bankruptcy be declared explicitly rather than left to inference from judicial opinions that may seem to limit creditors' rights. In re Geise, 992 F.2d 651, 659 (7th Cir. 1993).

A further difference between the cases is that, in Zells, once the uncertain contingent fee was earned, it would "contribute to the annual income figures relied upon in awarding maintenance and support." 572 N.E.2d at 945. Creditors of Carlson will never benefit from fees he obtains after his discharge from bankruptcy.

And because Carlson earned his entire fee before declaring bankruptcy, there was no possibility that entitling the trustee in bankruptcy to the fee would

interfere with Carlson's representation of his client. That representation was over. Suppose it hadn't been; suppose a lawyer declares bankruptcy halfway through a case that he's handling on a standard 33.3 percent contingent-fee basis and the value of his work to date, as measured by the opportunity cost of his time is, $10,000. And suppose that if he completes his work on the case he can expect a settlement of $60,000, entitling him to a contingent fee of $20,000 of which half will go to the trustee. His incentive to continue working hard on the case will be less than if his stake were $20,000. Suppose he discovers he'll have to invest not another $10,000 worth of his time, as he had thought, but $15,000. With only $10,000 to gain from successful completion of the case, he has little incentive to continue with it, though not none because slacking on a case may result in professional discipline. In re Howard, 721 N.E.2d 1126, 1135 (Ill. 1999); In re Arnold, 2000 WL 1838889, at *15 (Ill. Atty. Registration & Disciplinary Comm'n Sept. 6, 2000).

So the client might suffer from a rule that treats all potential contingent fees as assets of the estate in bankruptcy, though whether that would affect the bankruptcy status of the fees may be doubted--they would still be nonexempt property of the estate and bankruptcy courts have no general equitable power to deny such property to the creditors. But this point has no application to Gonzalez, since, as we mentioned, Carlson had completed all his work for him before declaring bankruptcy. And as the only issue is whether Carlson concealed any property from the trustee, we need not consider the other potential contingent fees he should have listed on his schedule of assets or how to balance the interest of the client against the interest of the lawyers' creditors. Carlson was rightly denied a discharge of his debts.

But we are not yet done with these two, Carlson and Hourigan. This case reveals merely the tip of an iceberg of improper practices that require the reference of both of them for possible discipline by the Illinois bar authorities, as well as the institution of our own proceedings against them. Hourigan is not the Good Samaritan that he represented himself at

the argument of this appeal to be. He was suspended from the practice of law for one year (or until he made restitution to his clients--whichever came later) in 1996 as a result of a long history of grossly mismanaging and neglecting clients' cases and even, it seems, converting part of a client's settlement to his own use. In re Hourigan, 1996 WL 931113 (Ill. Sept. 24, 1996). His numerous offenses are recounted in In re Hourigan, 1995 WL 936648 (Ill. Atty. Registration & Disciplinary Comm'n Apr. 5, 1995), where we read of his "pattern of making excuses and explanations which either strain credulity or are inconsistent and contradictory and which attempt to make excuses for his misconduct." Id. at *18. Particularly choice was his defense to the charge of converting a part of his client's settlement: he said he had disbursed it to an imposter! If so, as is hard to believe, he "acted in a most foolish and grossly negligent manner." Id. at *17. And who was Hourigan's counsel at his disciplinary proceeding? Carlson, of course. They deserve each other.

Carlson himself had been suspended for 60 days from the practice of law before his bankruptcy for neglecting clients' cases. In re Carlson, 1995 WL 936592 (Ill. Atty. Registration & Disciplinary Comm'n Nov. 5, 1995), approved 1996 WL 931008 (Ill. Mar. 26, 1996). The ARDC recommended him for another suspension, this one for three years, as a result of his bankruptcy scheming, which the disciplinary authorities found had involved fraud and dishonesty, as well as for his chronic neglect of client matters. "The inexorable conclusion is that [Carlson's] conduct was intentionally fraudulent and deceptive. It was designed to prevent the bankruptcy court from learning about funds that rightly belonged to the bankruptcy estate. This is deceptive and dishonest conduct of the most egregious kind, particularly so because [Carlson] engaged in it before a court. These facts also establish that [his] conduct is prejudicial to the administration of justice and brings the legal profession into disrepute." In re Carlson, 1999 WL 1491489, at *41 (Ill. Atty. Registration & Disciplinary Comm'n Dec. 27, 1999). He "intentionally omitted information in order to conceal assets from creditors,

the trustee and the bankruptcy court. Furthermore, much of this conduct, particularly the dishonesty, either overlapped, or followed closely behind, [his] three-month suspension [sic-- the reference is to the 60-day suspension] from the practice of law." Id. at *45. And he committed an identical fraud with respect to fees received from two other clients: "For many of the reasons stated previously, the Hearing Panel concludes that Carlson's failure to disclose these funds and the transfer to Lorraine [his ex-wife] constituted conduct involving dishonesty, fraud, deceit and misrepresentation, conduct prejudicial to the administration of justice, and conduct that tends to bring the courts and the legal profession into disrepute." Id. at *42.

Carlson and Hourigan have a long history of ignoring their clients' cases while at the same time vigorously and unrelentingly litigating their own cases, for example by appealing this present bankruptcy twice, even though there were no meritorious grounds of appeal either time. Cf. In re Riggs, 240 F.3d 668, 670 (7th Cir. 2001), where we remarked that "although Riggs has ignored most orders affecting his clients' rights, he responded with alacrity to an order issued on December 28 affecting his own interests: an order to show cause why he should not be disbarred."

We have no interest in punishing these two for delicts for which they have already been punished by the Illinoisdisciplinary authorities. But their continued pursuit of meritless and frivolous claims arising from their conspiracy to commit bankruptcy fraud represents an exacerbation and continuation of the offense for which Carlson has been disciplined. Indeed, Carlson's action in seeking discharge after the state disciplinary authorities found, by clear and convincing evidence, that not reporting the contingent fee was fraudulent and dishonest demonstrates contempt for the disciplinary and legal process. Hourigan has never been disciplined for his role in the bankruptcy, although as the one who received the contingent fee without consideration and then paid it out to Carlson in many installments he is both an accomplice and co-conspirator in

Carlson's acts and it is unclear why he should get off more lightly.

Carlson and Hourigan are hereby directed pursuant to Fed. R. App. P. 46(b)(1)(B) to show cause within 14 days from the date of this order why they should not be disciplined for professional misconduct. See In re Cook, 49 F.3d 263, 267-68 (7th Cir. 1995). A copy of this opinion is being sent to the Illinois Attorney Registration and Disciplinary Commission for such action as it may see fit to take.

Affirmed.