In re STERLING OPTICAL
CORP., Debtor.

Sterling Vision, Inc., Plaintiff,

v.

Sterling Optical Corp. and Fleet
Business Credit Corporation,
Defendants.

Bankruptcy No. 91–B–15944.
Adversary No. 95–8043A (MG).

United States Bankruptcy Court,
S.D. New York.

July 11, 2007.

Cole, Schotz, Meisel, Forman & Leonard, P.A., by Laurence May, Frederick E. Schmidt, New York, NY, for Plaintiff Sterling Vision, Inc.

Corey E. Friedman, Esq., by Cory E. Friedman, New York, NY, for Defendant Fleet Business Credit Corporation, n/k/a BAL Global Finance, LLC.

## MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

MARTIN GLENN, Bankruptcy Judge.

This matter is before the Court on a motion for partial summary judgment filed by the plaintiff Sterling Vision, Inc. ("Sterling Vision"). The defendant Sanwa Business Credit Corporation ("Sanwa")[1] filed a cross-motion for summary judgment. The Court has jurisdiction to hear this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).[2] Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. For the reasons explained below, Sterling Vision's motion for partial summary judgment is GRANTED and Sanwa's cross-

1. Sterling Vision brought this adversary proceeding against defendant Fleet Business Credit Corporation ("Fleet"), the successor to Sanwa Business Credit Corp. The Court will refer to Sanwa and Fleet collectively as "Sanwa" to minimize confusion.

2. Sanwa contended at the hearing on January 24, 2007 that this matter is not a "core" proceeding within the meaning of 28 U.S.C. § 1334. Sanwa previously raised this issue before Judge Gerber in its motion to dismiss this adversary proceeding for lack of subject matter jurisdiction. Judge Gerber held that the Court could exercise both "core" and "related to" jurisdiction. *See In re Sterling Optical Corp.*, 302 B.R. 792 (Bankr.S.D.N.Y. 2003). The Court declines Sanwa's invitation to revisit the subject matter jurisdiction issue. Sanwa did not brief the issue in connection with the pending motions but merely raised it in passing at the summary judgment hearing. Although Sanwa correctly notes that the doctrine of the law of the case does not prevent the Court from addressing the issue, *see Walsh v. McGee*, 918 F.Supp. 107, 112 (E.D.N.Y.1996) ("[Q]uestions of subject matter jurisdiction are generally exempt from law of the case principles.") and *Marcella v. Capital District Physicians' Health Plan*, 293 F.3d 42, 47 (2d Cir.2002) (stating that a question of subject-matter jurisdiction must be determined independently at every stage of a proceeding and that a district court's adherence to the law of the case cannot insulate its ruling against appellate review), the Court declines to revisit the issue previously decided by Judge Gerber, particularly since the only thing that has changed since the earlier ruling is the reassignment of the adversary proceeding to the undersigned.

motion for summary judgment is DE-NIED.

## BACKGROUND

On November 4, 2003, Sterling Vision moved for partial summary judgment pursuant to Bankruptcy Rule 7056 on Count I of the Complaint seeking an order declaring that (1) Sterling Vision is the owner of certain franchisee notes subject to Sanwa's rights to be repaid in full and (2) Sterling Vision is entitled to recover the residual value of the franchisee notes.[3] *See* Sterling Vision, Inc.'s Memorandum of Law in Support of Partial Summary Judgment at 1–2 (ECF # 43) (the "Motion"). Sterling Vision purchased most of the assets of Sterling Optical Corp. ("Optical" or "Debtor") in a § 363 sale in Optical's chapter 11 case. *See* Sale Order dated February 28, 1992 at 1–2 (the "Sale Order"). The purchased assets included Optical's rights, if any, arising from a letter agreement between Optical and Sanwa, dated November 29, 1990, and subsequently amended on several occasions (the "Letter Agreement"), and from certain franchisee notes payable by Optical's franchisees ("Franchisee Notes") and either pledged or sold by Optical to Sanwa pursuant to the Letter Agreement. The Franchisee Notes resulted from a financing arrangement Optical had with its franchisees. When Optical offered financing for franchisees to finance the construction of their stores, it took back notes from the franchisees, initially payable to Optical. Optical, in turn, funded its loans to franchisees through its financing arrangement with Sanwa, documented in the Letter Agreement.

The primary issue addressed by the parties in this adversary proceeding is the proper characterization of the transaction between Optical and Sanwa. The issue is hotly contested because the payments received by Sanwa under the Franchisee Notes ultimately exceeded the amount loaned (if it was a secured loan), or the purchase price Sanwa paid to Optical (if it was a sale).

Sterling Vision contends that Sanwa made a secured loan to Optical, secured by the Franchisee Notes receivables. *See Motion* at 12–13. If so, Sanwa would not be entitled to recover more than repayment of its loan, interest and authorized fees, and Sterling Vision as purchaser of Optical's assets would be entitled to recover the surplus proceeds, or so it claims. Sterling Vision contends that the Letter Agreement, despite the repeated use of language of "sale," has all of the indicia of a secured financing arrangement, the most important being that Optical retained all the risk associated with the underlying Franchisee Notes including the risk of nonpayment by the Debtor's franchisees. *Id.*

Conversely, Sanwa contends that it bought the Franchisee Notes outright for the amount it advanced and, therefore, it is entitled to everything collected on the Franchisee Notes—even if the amount Sanwa realized on the Franchisee Notes exceeded the amount it advanced to Optical. *See* Sanwa's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment at 22 (ECF # 53) (the "Cross Motion"). Sanwa's primary contentions in opposition to the Motion and in support of its Cross Motion are that (1) the language of the Letter Agreement is entirely consistent with a sale of the Franchisee Notes; (2) Optical consistently

---

**3.** The adversary proceeding was filed before the Court established its ECF system. Therefore, the Complaint does not appear as a stand-alone document on ECF. A copy of the Adversary Complaint can be found at Exhibit D to the Declaration of Cory E. Friedman (ECF # 53).

maintained in its SEC filings that the transaction with Sanwa was a sale of the Franchisee Notes; and (3) the Letter Agreement was an executory contract that was rejected by the Debtor pursuant to a post-confirmation stipulation and Court order dated April 16, 1997 (the "Rejection Stipulation") and, therefore, Sterling Vision cannot now reap the benefits of the original transaction.

The adversary proceeding was transferred to me on December 14, 2006. A summary judgment hearing was held on January 24, 2007. During the hearing the Court asked if it even needed to address the issue whether this transaction should be characterized as a true sale or as secured financing because regardless of its character the bankruptcy estate may have had a right to recover the surplus proceeds as property of the debtor's estate.[4] *See* Tr. (1/24/07) at 27. Paragraph 12 of the Letter Agreement provides that any funds in the "Reserve" account established pursuant to the Letter Agreement in excess of the funds needed for the Debtor to satisfy its repurchase obligations (primarily when franchisees defaulted on the Franchisee Notes) would be remitted to the Debtor in the absence of a default by Optical. *See* Letter Agreement at ¶ 12. Thus, in the absence of default by Optical, Optical had a right to recover any surplus funds after Sanwa recovered the amount of its advances, interest and authorized fees. As explained below, the parties dispute whether the right to recover any surplus funds survived Optical's default and rejection of the Letter Agreement, and whether

Optical's right to recover the surplus, if it existed, was transferred to Sterling Vision pursuant to the Sale Order. The Court directed the parties to file supplemental briefs addressing several questions, including whether the right to recover any surplus was property of the estate under § 541(a) of the Bankruptcy Code at the date of the bankruptcy filing. *See* Tr. (1/24/07) at 104.

On February 26, 2007, the parties filed their supplemental briefs. Sanwa reiterated its position that the Letter Agreement was an executory contract, *see* Sanwa's Supplemental Brief at 2 (ECF # 69), and that Optical's rejection of the Letter Agreement pursuant to the Rejection Stipulation relieved Sanwa of any future obligation to pay surplus proceeds to Optical. *Id.* at 7–9. Sanwa contends that the bankruptcy estate's only legal or equitable interest in the Letter Agreement was the right to assume, or assume and assign the agreement. *Id.* at 9–11. Since Optical rejected the Letter Agreement, Sanwa asserts, the agreement was materially breached by Optical and any right to the surplus money in the reserve account was "forfeit[ed]". *Id.*

Sterling Vision contends that regardless whether the transaction embodied by the Letter Agreement was a secured financing transaction or a true sale, the clear and unambiguous language of the Letter Agreement provided that the Reserve would be released to the Debtor if and when Sanwa received the contracted-for

---

**4.** Whether a Court should "recharacterize" a transaction denominated as a sale as, in fact, involving a secured financing is controversial, to say the least. Asset-backed transactions, using bankruptcy-remote special purpose entities as financing vehicles, ostensibly involving "true sales," are now a very significant means for raising capital. Caution is clearly in order when articulating legal principles supporting recharacterization because of the potential for unintended consequences for the capital markets. Here, as explained below, because the Court concludes that Sterling Vision is entitled to recover the surplus whether the financing arrangement was a true sale or a secured financing, the Court does not decide how the financing arrangement with Sanwa should be characterized.

amount from collections on the Franchisee Notes. *See* Sterling Vision's Supplemental Brief at 7 (ECF # 67). Sterling Vision further contends that nowhere in the Letter Agreement is there a clear and express statement that Sanwa would be entitled to retain all monies received from the Franchisee Notes if the Debtor breached the agreement after Sanwa received payment in full. *Id.*

## DISCUSSION

### I. Standard for Summary Judgment

Rule 7056 of the Federal Rules of Bankruptcy Procedure adopts Rule 56 of the Federal Rules of Civil Procedure, which provides that a party is entitled to summary judgment if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. Summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under governing law." *Id.* at 248, 106 S.Ct. 2505 (1986).

On a motion for summary judgment, the moving party has the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Id.* at 249, 106 S.Ct. 2505; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *U.S. v. Certain Funds on Deposit in Scudder Tax Free Inv. Account No. 2505103,* 998 F.2d 129, 131 (2d Cir.1993). Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's

case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine issue of fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Courts apply the same standards when considering cross-motions for summary judgment as are used for individual motions for summary judgment. *In re Worldcom, Inc.,* 361 B.R. 675, 681 (Bankr. S.D.N.Y.2007) (citing *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993)). Each motion must be considered independently of the other and the court must consider the facts in the light most favorable to the non-moving party for each. *Id.* In such a situation, the court is not required to grant judgment as a matter of law for one side or the other. *Id.*

Parties moving for or responding to a motion for summary judgment are required to file statements of material undisputed facts in compliance with Local Bankruptcy Rule 7056-1. Sterling Vision's statement sets forth 35 paragraphs of alleged material facts as to which it contends there are no material disputes ("Sterling 7056-1 Statement") (ECF # 43). All but eight of these paragraphs contain recitations of Sterling Vision's interpretation of various provisions of the Letter Agreement. *See, e.g.,* Sterling 7056-1 Statement ¶¶ 1–21 and 25–30. Several of the remaining paragraphs contain excerpts from internal Sanwa documents that Sterling Vision contends show that Sanwa treated the financing arrangement as a secured financing rather than a true sale. *See, e.g.,* Sterling 7056-1 Statement ¶¶ 31–35.

Sanwa filed its response to the Sterling 7056-1 Statement along with a cross statement of material facts ("Sanwa 7056-1 Statement") largely disputing Sterling Vi-

sion's interpretation of the various provisions of the Letter Agreement, and setting forth excerpts from the Letter Agreement and contending that these provisions are really indicative of a true sale financing arrangement. *See, e.g.,* Sanwa 7056–1 Statement ¶¶ 1–21 and 25–30 (ECF # 53).

Sanwa further contends that the language used in Sanwa's internal documents do not evidence the nature of the transaction and do not reflect that Sanwa intended the transaction to be a financing arrangement because the language used in these documents was merely dictated by the software Sanwa used in its business operations. *See, e.g.,* Sanwa 7056–1 Statement ¶¶ 34–35. Sanwa also contends that the transaction was contemplated as a sale from its inception, *see* ¶ 37, and that Optical represented in various forms filed with the United States Securities and Exchange Commission that it had sold receivables to Sanwa, *see* ¶¶ 48–51.

In its response to the Sanwa 7056–1 Statement ("Sterling Vision's Response to Sanwa 7056–1 Statement"), Sterling Vision contends that Sanwa mischaracterizes the language and selectively quotes from the various forms filed with the United States Securities and Exchange Commission. *See, e.g.,* Sterling Vision's Response to Cross Statement ¶¶ 48–51 (ECF # 65). Sterling Vision further disputes the fact that the transaction was contemplated as a sale from its inception.[5]

The Court concludes that the only a few facts—all undisputed—are needed to resolve the pending summary judgment motions. Specifically, the Letter Agreement sets forth the terms of the financing arrangement between Sanwa and Optical. It provides that absent a default Optical was entitled to recover surplus proceeds after Sanwa was repaid all of its advances, interest and authorized fees.[6] As part of its chapter 11 proceeding, Optical rejected the Letter Agreement. The Sale Order entered by the Court approving the § 363 sale of most of Optical's assets to Sterling Vision determines whether Sterling Vision acquired Optical's rights, if any, to recover surplus proceeds following rejection of the Letter Agreement.

Determining whether the financing transaction was a sale or secured financing would require the Court to determine the intent of the parties, something that can be difficult to resolve on summary judgment. *See, e.g., Fleet Capital Corp. v. Yamaha Motor Corp.,* No. 01–CV–1047, 2002 WL 32063614 (S.D.N.Y. Sept. 26, 2002) (denying motion for summary judgment because there existed factual disputes regarding whether the parties intended to effectuate loans or true sales and the parties presented conflicting evidence as to the way parties to the agreement treated the transactions for accounting purposes). Courts examine many factors in many different contexts in deciding how properly to characterize

---

**5.** The Court questions whether Sterling Vision or Sanwa fairly responded in good faith to the statement of material facts submitted by the other party. Many responding paragraphs do not fairly meet the thrust of the factual statements, they contain inadequate factual support, or they contain only conclusory assertions designed, it appears, to create the appearance of disputed facts in an effort to create "a genuine issue to be tried" where none may exist. But the Court need not decide if there is a genuine issue to be tried

whether the financing transaction was a sale or secured financing since the result here would be the same either way.

**6.** *See* Tr. (1/24/07) at 49–50 (Mr. Friedman (Sanwa's counsel): "I think the deal was that under the original retainage it would—it was retainage, it would have been remitted had it been fully performed, because that's what it was. It was a retainage. It was basically a holdback on the purchase price.").

such transactions. *See generally* Robert D. Aicher and William J. Fellerhoff, *Characterization Of A Transfer Of Receivables As A Sale Or A Secured Loan Upon Bankruptcy Of The Transferor,* 65 Am. Bankr.L.J. 181 (1991). As explained below, however, the parties' intent does not control the issues decided by the Court.

## II. The Applicability Of Article 9 To This Financing Arrangement

The parties agree that Illinois law governs the state law issues in this adversary proceeding. *See* Sterling Vision's Supplemental Brief at 2, n. 4; Sanwa's Supplemental Brief at 2. Article 9 of the Illinois UCC encompasses both sales of, and secured interests in, chattel paper.[7] Section 9–102(1) of the Illinois UCC applies "(a) to any transaction (regardless of its form) which is intended to create a security interest in ... chattel paper ...; and also (b) to any sale of ... chattel paper." Illinois UCC § 9–102(1).[8] The distinction between an outright sale and a transaction intended to create a security interest can be significant as there are different rules about who is entitled to keep any surplus. Section 9–502(2) of the Illinois UCC concerns rights to any surplus. It provides:

(2) A secured party who by agreement is entitled to charge back uncollected collateral or otherwise to full or limited recourse against the debtor and who undertakes to collect from the account debtors or obligors must proceed in a commercially reasonable manner and may deduct his reasonable expenses of realization from the collections. *If the security agreement secures an indebtedness, the secured party must account to the debtor for any surplus, and unless otherwise agreed, the debtor is liable for any deficiency. But, if the underlying transaction was a sale of accounts or chattel paper, the debtor is entitled to any surplus or is liable for any deficiency only if the security agreement so provides.*

Illinois UCC § 9–502(2) (emphasis added).

 Thus, if the financing arrangement between Optical and Sanwa was intended to secure Optical's indebtedness, Sanwa would be obligated to account for and pay over the surplus to the Debtor. The Debtor's right to any surplus in such a case cannot be waived even by an express agreement, *see* Illinois UCC § 9–501(3)(a). Alternatively, if the financing arrangement resulted in a sale of the Franchisee Notes by Optical to Sanwa, then Sanwa would

---

7. The Franchisee Notes are "chattel paper" under § 9–105(1)(b) of the Illinois UCC. "Chattel paper" means "a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods.... When a transaction is evidenced both by such a security agreement or a lease and by an instrument or a series of instruments, the group of writings taken together constitutes chattel paper...." Illinois UCC § 9–105(1)(b).

8. Effective July 1, 2001, Illinois adopted revised Article 9 of the UCC (the "Revised UCC"). *See* 810 Ill. Comp. Stat. 5/9–101, *et seq.* (2001). Section 9–702(c) provides, however, that "Revised Article 9 does not affect an action, case, or proceeding commenced before Revised Article 9 takes effect." Illinois UCC § 9–702(c). A bankruptcy case is "an action, case, or proceeding" within the meaning of § 9–702(c) and the date of the bankruptcy case filing determines which version of Article 9 applies. *Bank of America N.A. v. Outboard Marine Corp., et al. (In re Outboard Marine Corp.),* 300 B.R. 308, 315 (Bankr. N.D.Ill.2003) (collecting cases). In this case, Optical filed its petition for relief on December 31, 1991, prior to the effective date of the Revised UCC. Thus, the prior version of the Illinois UCC applies here.

All further references to the Illinois UCC in this Opinion are to the 1990 version of the Illinois UCC, the version then in effect when this transaction was consummated.

have been entitled to all proceeds received from the Franchisee Notes *unless the agreement provides otherwise.* As explained below, the Letter Agreement indeed provides that the Debtor was entitled to the surplus. *See* Section IV, *infra,* at 689–91. Therefore, absent any consequences resulting from Optical's default or rejection of an executory contract, Optical would be entitled to recover a surplus whether the Letter Agreement was a sale or secured financing.

### III. Sterling Vision Acquired Optical's Right To Recover The Surplus Whether The Transaction Was A Secured Financing Or A Sale

■ A threshold issue that must be decided is whether Sterling Vision has standing to pursue this matter.[9] To have standing, Sterling Vision must have a personal stake in the outcome of this controversy. *See In re Esmizadeh,* 272 B.R. 377, 383 (Bankr.E.D.N.Y.2002) ("In order to have standing, a party must have a 'personal stake in the outcome of the controversy and suffer, or be threatened with, some actual injury.'") (quoting *Rion v. Spivey (In re Springer),* 127 B.R. 702, 705 (Bankr.M.D.Fla.1991)). The answer turns on whether Optical's rights, if any, to recover the surplus were transferred by the Debtor to Sterling Vision pursuant to the Sale Order. If the rights to the surplus funds were not transferred to Sterling Vision then it would not have standing to pursue this matter.

The Court concludes that Sterling Vision has standing. This is true whether the financing arrangement was a secured financing, as Sterling Vision contends, or a true sale, as Sanwa contends. Optical clearly had standing to sue to recover the surplus. This right to recover the surplus was transferred to Sterling Vision pursuant to the Sale Order. Section 1 of the Sale Order expressly provides:

> *Sale and Purchase of the Business:* Subject to the terms and conditions hereof . . . Seller will sell, convey, transfer and deliver to Buyer, and Buyer will purchase from Seller, the Business . . . including, without limitation, the following (collectively, the "Acquired Assets"):
>
> . . . .
>
> (x) all of Seller's rights with respect to all franchisee notes, including franchisee notes that have been pledged (or "sold") in connection with the Bank Debt (as defined below). . . .

Sale Order at Section 1(a)(x), p. 3.

In turn, the term Bank Debt is defined in Section 1(i) of the Sale Order to mean:

> *Bank Debt:* Buyer is hereby authorized to negotiate with each of CIT, Sanwa, and GECC (collectively, the "Lenders") with respect to restructuring the terms of Seller's outstanding indebtedness to each of the Lenders which is secured by notes payable to Seller issued by Seller's franchisees (such indebtedness . . . being hereafter referred to as "Bank Debt"). . . . For all purposes of this Agreement, the Bank Debt shall be deemed to be secured indebtedness of Seller and the franchise notes "sold" to the Lenders pursuant to the agreements

**9.** Sanwa contends that the Sale Order did not provide for the sale of equitable rights in the Letter Agreement to Sterling Vision and that these claims remained with the bankruptcy estate. *See* Sanwa's Supplemental Brief (ECF # 69 at 9, n. 4). Sanwa further contends that the Sale Order only approved the sale of the Franchisee Notes themselves—and only if the Debtor actually owned them. *Id.* In essence, Sanwa contends that Sterling Vision would not have standing to pursue this matter if the transaction embodied in the Letter Agreement is an executory contract that was subsequently rejected and, therefore, gave rise to equitable claims by Optical against Sanwa.

evidencing the Bank Debt shall be treated as assets of the Seller (and thus to be transferred to Buyer as part of the Acquired Assets) pledged to secure such Bank Debt.... The Acquired Assets include Seller's rights with respect to the franchisee notes referred to in section 1(a)(x).

Sale Order at Section 1(i), p. 15.

These definitions establish that all of Optical's rights with respect to the Franchisee Notes arising from the Letter Agreement were transferred to Sterling Vision. If the financing transaction was a secured financing, Optical would have been entitled to recover the surplus. Illinois UCC § 9–502(2) ("If the security agreement secures an indebtedness, the secured party must account to the debtor for any surplus."). That right was transferred to Sterling Vision. As explained below, if the transaction was a true sale, while the Debtor may not have been able to enforce its contract right to the surplus after a default and rejection of the Letter Agreement, the Debtor had an equitable cause of action for restitution to recover the surplus. This equitable cause of action was property of the estate pursuant to § 541 of the Bankruptcy Code upon the commencement of the chapter 11 case. *See infra* at 692–94. This cause of action was also transferred to Sterling Vision pursuant to either one of two subsections of the Sale Order—Sections 1(a)(x) (set forth above) or 1(a)(xi) ("all other assets of the Seller, other than the Excluded Assets"). *See* Sale Order at § 1(a)(xi), p. 3. The term Excluded Assets used in Section 1(a)(xi) is comprehensive but in no way encompasses the equitable rights or causes of action (*i.e.* right to restitution) arising from the Letter Agreement. *See* Sale Order at § 1(b),

p. 3. It is thus clear that the Debtor's right, if any, to collect the surplus was transferred to Sterling Vision. Accordingly, Sterling Vision has standing to pursue this matter.

## IV. Absent Breach or Rejection Optical Had the Right to Recover the Surplus

Absent a breach by Optical the Letter Agreement entitled the Debtor to recover any surplus above the amounts due and owing to Sanwa. Paragraph 12 of the Letter Agreement provides that any funds in the Reserve account in excess of the funds needed for the Debtor to satisfy its repurchase obligations would be remitted to the Debtor.[10] *See id.* at ¶ 12. The Reserve was established for the benefit of the Debtor and would, from time to time, be recalculated in accordance with a formula set forth in paragraph 12. Specifically, paragraph 12 provided:

12. *Reserves.*

An interest bearing reserve which shall secure all of your obligations and liabilities to [Sanwa] including, without limitation, with respect to Contract repurchases for any Contracts.... The Reserves will be created by [Sanwa] withholding, from the purchase price of such Contract an amount equal to: (ii) fifty percent (50%) of such purchase price for each such contract until such time as the aggregate purchase price of all Contracts purchased by us equals $6,000,000; plus (ii) twenty-five percent (25%) of such purchase price for each such Contract after such time as the aggregate purchase price of all Contracts purchased by us exceeds $6,000,000. The Reserves will earn interest monthly....

---

**10.** Paragraph 11 of the Letter Agreement required Optical to repurchase from Sanwa any

Franchisee Notes that were in default.

[The Debtor] hereby grant[s] to [Sanwa] a continuing lien and security interest in the Reserves as security for all of [the Debtors] obligations and liabilities to [Sanwa]. In the event [the Debtor] fail[s] to make timely payment of any amount requested by [Sanwa] pursuant to the terms of this Agreement, [Sanwa] may at any time thereafter apply amounts held in the Reserve against any such requested payment, and in such event [the Debtor] will immediately pay to [Sanwa] the amount necessary to restore the Reserves to the amounts therein as of the time of [Sanwa's] application.....

*See* Letter Agreement at ¶ 12.

Paragraph 12 of the Letter Agreement also provided that "After December 31 of each year commencing with December 31, 1991, we will review the amount of each Reserve and provided, (i) you are not in material default of any of your obligations or liabilities under this Agreement ... the Reserve related to such Group will be adjusted...." To the extent the amount in the Reserve exceeded the adjusted formula, the surplus was to be remitted to the Debtor. With respect to Sanwa's obligation to remit any surplus to the Debtor, paragraph 12 provided:

> 12. *Reserves.*
>
> .... In the event the adjusted Reserve amount for a group is less than the Reserve related to such Group which is held by [Sanwa] then [Sanwa] will

remit the difference to [the Debtor]. In the event the adjusted Reserve amount for a group is greater than the Reserve related to such Group which is held by [Sanwa] then [the Debtor] will remit the difference to [Sanwa].

*See* Letter Agreement at ¶ 12.

The Letter Agreement was subsequently amended effective August 1, 1991 (hereafter the "August 1, 1991 Amendment"). The August 1, 1991 Amendment made extensive changes to the Letter Agreement, particularly with respect to the Reserve.[11] Paragraph 12 of the original Letter Agreement dealing with the Reserve was replaced with a new paragraph 12. This amendment materially changed the calculation of the Reserve but nevertheless reaffirmed both parties' intention that monies collected by Sanwa in excess of the Remittance Amount would be placed in the Reserve, that the Reserve would belong to the Debtor, and that upon satisfaction of all of the Debtor's obligations to Sanwa, the entire Reserve, plus interest, would be released to the Debtor. Paragraph 12 provides in relevant part:

> 12. *Reserves.*
>
> (a) *Creation.* An interest-bearing reserve which secures all of your [the Debtor's] obligations and liabilities to us [Sanwa] including, without limitation, those with respect to Contract repurchases for any Contracts.... Additions to the Reserves

---

**11.** Paragraph 8 of the Letter Agreement was amended, withdrawing the Debtor's right to collect and administer the Franchisee Notes and committing Sanwa to collect payments on the Franchisee Notes, with the proceeds to be applied against a "Remittance Amount." "Remittance Amount" was defined in paragraph 1(b) of the August 1, 1991 Amendment to mean "at any time, with respect to any Contract the amount due with respect to such [Franchisee Note] through the given payment period, as determined in accordance with the

group amortization schedule delivered to us along with the Second Amendment to Letter Agreement dated August—, 1991." Effectively, each month the amounts collected by Sanwa from the Debtor's franchisee were to be applied to reduce the principal amount of the Debtor's obligation according to an amortization schedule. To the extent that collections on Franchisee Notes exceeded the "Remittance Amount," the excess would be placed into the Reserve.

may occur during a given month if the Payments collected by us [Sanwa] during that month exceed the aggregate of the Remittance Amounts we [Sanwa] are scheduled to receive that month according to the group amortization schedule.... In addition, the Reserves will earn interest monthly at an annual rate....

(b) *Application.* [The Debtor] hereby grant[s] to [Sanwa] a continuing lien and security interest in the Reserves as security for all of your obligations and liabilities to [Sanwa]. In the event [the Debtor] fail[s] to make timely payment of any amount requested by [Sanwa] pursuant to the terms of this Agreement, [Sanwa] may at any time thereafter apply amounts held in the Reserve against any such requested payment, and in such event [the Debtor] will immediately pay to [Sanwa] the amount necessary to restore the Reserves to the amounts therein as of the time of [Sanwa's] application. In addition to the security purposes mentioned above, we may apply any of the Reserves to any shortfall in the amount of a Payment that we are scheduled to receive from an Obligor during a given month....

(c) *Excess Reserves.* If you are not then in breach of any of your covenants in this Agreement, we [Sanwa] will, ... remit to you upon your request any excess cash in the Reserve above $40,000 existing on that date.

*See* Letter Agreement at ¶ 12.[12]

Thus, the funds that were required to be deposited in the Reserve were property of the Debtor's estate, subject to the lien and security interest in favor of Sanwa to assure repayment of all amounts due. Once Sanwa received the full amount it was due, the remaining funds in the Reserve were property of the Debtor's estate unencumbered by any interest of Sanwa. The rights to this Reserve were transferred to Sterling Vision by the Sale Order and provide further support for the relief sought by Sterling Vision.

## V. Sterling Vision Is Entitled To the Surplus Even Though the Letter Agreement Was an Executory Contract That Was Deemed Rejected

■ The Debtor's right to the surplus held or that might thereafter accumulate in the Reserve—although it may have been contingent at the time of the filing of Debtor's chapter 11 petition—would constitute property of the Debtor's estate under § 541 of the Bankruptcy Code. Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The term 'legal or equitable interests ... in property' has been broadly interpreted to include any legally enforceable right...." *In re Carlson,* 263 F.3d 748, 750 (7th Cir.2001) (citing *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983)). Further, this definition is broad and includes even strictly contingent interests. *In re Mid–Island Hospital, Inc.,* 276 F.3d 123, 128 (2d Cir. 2002) (finding debtor's "speculative" and "intangible" interest in withheld funds to constitute property of the estate) (citing *Brown v. Dellinger (In re Brown),* 734 F.2d 119, 123 (2d Cir.1984)). As discussed above, Optical's rights to recover the sur-

---

12. The Debtor was also required to cover any deficiency in the event the funds in the "Reserve" account were insufficient to cover the Debtor's repurchase obligations under the Letter Agreement. *See id.*

plus were property of the estate that was subsequently transferred to Sterling Vision pursuant to the Sale Order.[13]

The effects of rejection of an executory contract under § 365 of the Bankruptcy Code were clearly set forth in by the Second Circuit in *In re Lavigne,* 114 F.3d 379 (2d Cir.1997):

> If the contract has not been previously assumed, rejection of the debtor's executory contract constitutes a breach of the contract. While rejection is treated as a breach, it does not completely terminate the contract. Thus, "[r]ejection merely frees the estate from the obligation to perform; it does not make the contract disappear." . . . .
>
> Rejection gives rise to a remedy for breach of contract in the non-debtor party. The claim is treated as a pre-petition claim, affording creditors their proper priority. Under sections 365(g) and 502(g), the date of breach is set as the date immediately prior to the debtor's filing for bankruptcy. The Bankruptcy Code treats rejection as a breach so that the non-debtor party will have a viable claim against the debtor. However, the Code does not determine parties'

rights regarding the contract and subsequent breach. To determine these rights, [a court] must turn to state law. 114 F.3d at 386–87.

■ Applying *Lavigne,* even though the Letter Agreement was an executory contract that was rejected pursuant to the Rejection Stipulation, rejection merely constituted a "breach" of the Letter Agreement giving Sanwa an unsecured prepetition claim. The Letter Agreement was not terminated. Illinois state law determines the effect of rejection.

■ Under Illinois law, a party suffering injury is entitled only to a cause of action for damages actually sustained. *Wanderer v. Plainfield Carton Corp.,* 40 Ill.App.3d 552, 351 N.E.2d 630, 634 (1976). In all actions on contract sounding in damages, the plaintiff is entitled to recover damages only to the extent of the injury sustained. *Id.* This measure of "actual loss" indicates that damages for breach of contract are compensatory in nature, in restitution for the harm caused, and should only make the injured party whole again, or in the position he would have been in had the contract been performed, and not

---

**13.** Under the Illinois UCC, if the financing arrangement resulted in a sale of the Franchisee Notes, then Sanwa would be entitled to all proceeds received from the Franchisee Notes unless the Letter Agreement provides otherwise. Here, the Letter Agreement provides that the excess funds would be returned to Optical unless it was in breach of any of its covenants in the Letter Agreement. Paragraph 12(c) governs the disposition of excess reserves and provides that if Optical is not "then in breach of any of [its] covenants in this Agreement, [Sanwa] will, . . . remit to [Optical] upon [Optical's] request any excess cash in the Reserve above $40,000 existing on that date." *See* Letter Agreement at 12. Sanwa even admits that Sterling Vision had a contractual right to any excess funds—if Sterling Vision was not in default. *See Cross Motion* at p. 22. However, Sanwa argues that Sterling Vision was in continuous default

and, therefore, cannot rely on this contractual provision. *See id.* While a material default by Optical would excuse further performance by Sanwa and preclude Optical from enforcing contractual rights favorable to it, Optical—and Sterling Vision as its assignee—could still pursue equitable causes of action to recover the surplus. *See infra* at 693–94.

Even in the absence of a separate default, the Debtor would not be able to enforce provisions of the Letter Agreement after rejecting the contract under § 365 of the Bankruptcy Code. A debtor "may not reject (i.e., breach) one obligation under a contract and still enjoy the benefits of that same contract." *In re Comdisco, Inc.,* 270 B.R. 909, 911 (Bankr. N.D.Ill.2001) (citing *AGV Productions, Inc. v. Metro–Goldwyn–Mayer, Inc.,* 115 F.Supp.2d 378, 391 (S.D.N.Y.2000)). This result does not, however, bar enforcement of equitable (non-contract) rights.

in a better position than if there had been performance. *Id.; see also In re Witte,* 841 F.2d 804, 807 (7th Cir.1988) (applying Illinois law) ("Remedies for a breach of contract are intended to make the injured party whole by compensating him so that he will be in the same position he would have been in if the contract had been fully performed."); *Golen v. Chamberlain Mfg. Corp.,* 139 Ill.App.3d 53, 93 Ill.Dec. 677, 487 N.E.2d 121, 127 (1985) ("[C]ompensation awarded in a breach of contract action should not provide the plaintiff with a windfall recovery.").

 Under Illinois law, Sanwa, as the non-breaching party to the Letter Agreement, was left with a damage claim to make it whole so that it would be in the same position as if the Letter Agreement had been fully performed. But Sanwa would not be entitled to be put in a better position than if the Letter Agreement was actually performed (*i.e.,* it received the contracted-for amount from collections on the Franchisee Notes). In other words, Sanwa is not entitled to the windfall recovery it now seeks to retain.[14]

Section 374 of the Restatement (Second) of Contracts addresses the remedy of restitution:

> (1) Subject to the rule stated in Subsection (2) [which is inapplicable to the instant case], if a party justifiably refuses to perform on the ground that his remaining duties of performance have been discharged by the other party's breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach.

Restatement (Second) of Contracts § 374; *see also In re Fenton AMC Jeep, Inc.,* 35

B.R. 263 (Bankr.Mich.1983) (denying defendant's motion for partial summary judgment on trustee's restitution claim and stating that remedy of restitution is available to avoid unjust enrichment of defendant even where debtor breached franchise agreement by submitting late and incomplete claims).

Further, the Restatement (Third) of Restitution § 36 (Tentative Draft No. 3, 2004) addresses restitution to a party in default. Section 36 provides in relevant part:

> (a) A party whose incomplete or defective performance prevents a recovery on the contract has a claim in restitution against the recipient as necessary to prevent unjust enrichment, not exceeding the net benefit thereby conferred.

Restatement (Third) of Restitution § 36 (Tentative Draft No. 3, 2004).

 Illinois courts recognize the remedy of restitution as a means to prevent unjust enrichment. For example, the court in *Raintree Homes, Inc. v. Village of Long Grove,* 209 Ill.2d 248, 282 Ill.Dec. 815, 807 N.E.2d 439, 445 (2004) stated:

> [I]f the plaintiff has no substantive claim grounded in tort, contract, or statute, then if the plaintiff's claim is viable at all, it must be one for restitution to prevent unjust enrichment. That is so because restitutionary ideals form the only substantive basis for the claim. In that case, the recovery will force disgorgement of the defendant's gains (restitution) and also provide the equivalent of compensation (damages). Even so, if unjust enrichment is the only substantive basis for that recovery, the claim is for restitution.

---

**14.** Sanwa asserts that the Letter Agreement was materially breached causing the Debtor to forfeit any right to the excess money in the Reserve account. Sanwa's Supplemental Brief at 8. Assuming the Debtor was in material breach of the Letter Agreement, the Debtor would still be entitled to seek restitution and recover any surplus. *See infra* at 694.

*Id.* (citing D. Dobbs, Remedies § 4.1(1) (2d ed.1993)).

Here, even though the Letter Agreement was an executory contract that was rejected, thereby preventing the Debtor from enforcing its contractual right to recover the surplus, the Debtor would nevertheless have an equitable cause of action (*i.e.*, claim for restitution) to recover the surplus. The cause of action for restitution, even though it may have been contingent at the time of the filing of chapter 11 petition, became property of the Debtor's estate upon the commencement of the chapter 11 case under § 541 of the Bankruptcy Code.[15] That cause of action was subsequently transferred to Sterling Vision pursuant to the Sale Order. Accordingly, any surplus funds belong to Sterling Vision.

## VI. Sanwa's Cross Motion For Summary Judgment Must Be Denied

Sanwa cross moved for summary judgment seeking a declaration that it is entitled to retain any surplus. It follows from the Court's ruling above that Sanwa's cross motion must be denied.

## CONCLUSION

While the Court has concluded that Sterling Vision is entitled to partial summary judgment on Count I of the Complaint, declaring that Sterling Vision is entitled to recover the surplus, further proceedings are required to determine the amount of its recovery, if any. No evidence of the amount of the surplus has been provided. Furthermore, the parties have not addressed, and the Court has not decided, whether Sanwa is entitled to any offsets, for example for "reasonable expenses of realization from the collections," Illinois UCC § 9–502(2), which applies if the transaction were a secured financing, or an equivalent rule that applies for restitution[16] if the transaction were a true sale. A separate Case Management and Scheduling Order will be entered allowing a

15. The cause of action for restitution would be "property" of the Debtor under Illinois law. Illinois courts have stated that "property" includes every interest in everything subject to the ownership of man. *Webster v. Redmond,* 443 F.Supp. 670, 676 (N.D.Ill. 1977), *aff'd in part, rev'd in part on other grounds* 599 F.2d 793 (7th Cir.1979), *cert. denied* 444 U.S. 1039, 100 S.Ct. 712, 62 L.Ed.2d 674 (1980). The term is sufficiently comprehensive to include every interest in any and every thing which is subject to ownership. *Vollmer v. McGowan,* 409 Ill. 306, 99 N.E.2d 337, 341 (1951); *see also Stilo v. Stilo,* No. 36,279, 270 Ill.App. 527, 1933 WL 2556, *5 ( May 23, 1933) ("The word 'property' embraces money, debts, and choses in action of every kind, as well as articles that can be seen and handled.").

16. *See* Restatement (Third) of Restitution § 36 cmt. c (Tentative Draft No. 3, 2004) (*"Amount of recovery; burden of proof.* There is a claim in restitution in respect of defaulted contractual performance only if and to the extent the claimant can prove that the benefit thereby conferred, less the costs attributable to the default, has resulted in the net enrichment of the defendant. Requiring the claimant to carry the burden of proof on the key issue of net enrichment does not mean that the claimant must produce evidence within the knowledge of the defendant. It does mean that when the net enrichment of the defendant cannot be clearly established, restitution will be denied.

Net enrichment is measured by reference to the defendant's contractual expectation. Because the award is net of damages caused by claimant's default, the particular items entering into the account reflect the standard calculation of damages in the relevant transactional setting: lost profits in one case, cost of cure or completion in another. The uniform test is to compare the defendant's actual position with the position the defendant would have occupied in the absence of breach. .... Given the difficulty in many circumstances of quantifying the injury to the defendant from the claimant's breach, the appropriate reduction may be liberally estimated. The object is to insure that the defendant will under no·

limited period for additional discovery on any issues concerning the amount of any surplus and offsets, and for further pre-trial proceedings and trial.

For the reasons stated above, Plaintiff Sterling Vision's Motion for Partial Summary Judgment is GRANTED and Defendant Sanwa's Cross Motion for Summary Judgment is DENIED.

**IT IS SO ORDERED.**

circumstance be left with a net loss from the transaction; and a party who has elected not to perform the contract cannot insist on a nice calculation of extracontractual benefits conferred.'').